UNITED STATES of America,
Plaintiff,

v.

REAL PROPERTY IN SECTION 9, TOWN 29 NORTH, RANGE 1 WEST, TOWNSHIP OF CHARLTON, OTSEGO COUNTY, MICHIGAN, Defendant,

Daniel S. Gahagan, Michael J. Gahagan, and Agnes Riddle–Gahagan, Claimants.

No. 87–10338–BC.

United States District Court,
E.D. Michigan,
Northern Division.

March 23, 2004.

Neil P. Wackerly, Allsopp, Kolka, Bay City, MI, Daniel Gahagan, pro se, Newberry, FL, Michael J. Gahagan, pro se, Avon, CO, Daniel S. Gahagan, Johannesburg, MI, for Claimants.

## OPINION AND ORDER GRANTING GOVERNMENT'S MOTIONS FOR SUMMARY JUDGMENT OF FORFEITURE AS TO CLAIMANTS DANIEL AND MICHAEL GAHAGAN AND AS TO CLAIMANT AGNES RIDDLE–GAHAGAN, DENYING MOTIONS FOR SUMMARY JUDGMENT BY CLAIMANTS DANIEL AND MICHAEL GAHAGAN AND BY CLAIMANT AGNES RIDDLE–GAHAGAN, DENYING MOTION BY CLAIMANT DANIEL GAHAGAN FOR RELEASE FROM ARREST, DENYING MOTION BY CLAIMANT DANIEL GAHAGAN FOR SUMMARY JUDGMENT PURSUANT TO THE EXCESSIVE FINES CLAUSE OF THE EIGHTH AMENDMENT, DENYING MOTION BY CLAIMANT DANIEL GAHAGAN FOR COMPENSATION FOR SUPPRESSION OF EVIDENCE, AND DENYING GOVERNMENT'S MOTION TO STRIKE

LAWSON, District Judge.

This forfeiture action, on remand from the court of appeals, is in its seventeenth year. The government originally filed a verified complaint in 1987 seeking to forfeit certain real estate, personal property, and the proceeds from the sale of certain of those items. The real estate was divided into nine parcels for analytical purposes, however prior adjudications and concessions have narrowed the dispute to focus on three parcels of real estate (including surface and mineral rights) claimed by Daniel and Michael Gahagan, and a mortgage interest in one of those parcels claimed by Agnes Riddle–Gahagan. The layout of the parcels is set forth in the diagram attached as an appendix to this opinion, reference to which is necessary to understand the history of this case and the parties' arguments.

The original judge presiding over this case, the Honorable James P. Churchill, held in 1992 that the government established probable cause to believe that Parcels A, B, C and D (but not parcel E) were used to facilitate the distribution of controlled substances, and that there was probable cause to believe that a limited interest in Parcels D and E were proceeds in exchange for controlled substances, although the installment contract for Parcel E was paid in full before the forfeiture act became effective and therefore no part of Parcel E was subject to forfeiture. Judge Churchill also found that the government had no valid claim to any of the sale proceeds or interests in Parcels A, B, C2, D2, E2, or any of the personal property. He also held that Agnes Riddle–Gahagan's mortgage interest in Parcel D must be determined in later proceedings, although she was entitled to innocent owner status with respect to her interest in Parcels A, B, C and E. *See* dkt. # s 403, 499, 516. District Judge Robert H. Cleland, the second judge to have presided over this matter, entered judgment in favor of the government in 1997 determining that the claimants failed to overcome the government's probable cause showing, their affirmative defenses, including those based on the Excessive Fines Clause of the Eighth Amendment and the Double Jeopardy Clause of the Fifth Amendment, lacked merit, and the government was entitled to forfeiture of Parcels C1, D1 and D3. *See* dkt. # 609. In a later proceeding, Judge Cleland found that Agnes Riddle–Gahagan failed to establish by a preponderance of evidence that she was an innocent owner of her mortgage interest in Parcel D1 and declared that interest subordinate to the government's interest in the parcel. The parties conceded that Parcels A and B were subject to forfeiture.

The claimants appealed the decision with respect to Parcels C1, D1 and D3. While the appeal was pending, Congress passed the Civil Asset Forfeiture Reform Act of 2000, 114 Stat. 202, 18 U.S.C. § 983 (2000) (CAFRA), which, among other things, changed the government's burden of proof in forfeiture cases. The court of appeals held that the legislation was remedial and applied to these proceedings. *See United States v. Real Property in Section 9, Town 29 North, Range 1 West Tp. of Charlton, Otsego County, Mich.,* 241 F.3d 796 (6th Cir.2001). The case was remanded to this Court "for further proceedings applying the new forfeiture statute to this case." *Id.* at 800.

On remand, the parties have filed a variety of motions, some of which encompass matters already ruled upon by predecessor judges. The government has renewed its motion for summary judgment arguing that the undisputed evidence establishes its right to forfeiture under the preponderance of evidence standard, and Judge Cleland's ruling rejecting the claimants' defenses should remain intact. The claimants also moved for summary judgment contending that the government cannot meet the new and higher burden of proof, which requires the government to "establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c). The Court finds that the government has satisfied the requirements of CAFRA, the claimants' motions lack merit, and the government is entitled to a judgment of forfeiture of Parcels C1, D1 and D3.

## I. Background

### A. Facts

The claimants in this civil forfeiture case are two brothers, Daniel and Michael Gahagan, and their mother, Agnes Riddle Gahagan. The case now concerns three parcels of property in Otsego County, Michigan, identified as Parcels C1, D1 and D3. This case began with an investigation into the drug trafficking activities of Daniel and Michael and Michael's then-girlfriend, Susan Soper. Daniel and Michael eventually entered conditional guilty pleas, and they challenged on appeal the trial court's adverse ruling on a motion to suppress evidence. The court of appeals discussed the facts in its ruling affirming the convictions, *United States v. Gahagan,* 865 F.2d 1490, 1491–94 (6th Cir.1989):

On May 21, 1987, an indictment was returned against Daniel Gahagan, his brother Michael Gahagan, and Susan Soper. A superseding indictment against the same three individuals was returned on July 29, 1987. The three were charged with conspiracy to possess with the intent to distribute and to distribute marijuana and hashish in count one of the indictment. Daniel Gahagan and Michael Gahagan were also charged in count five with distributing approximately 141 grams of hashish, in count six with possession with the intent to distribute approximately 840 grams of marijuana, and in count seven with possession with the intent to distribute approximately 311 grams of hashish. Michael Gahagan, in addition to being charged in the conspiracy charge in count one, and counts five, six and seven, was charged in count two with distributing approximately 108 grams of marijuana, and count three with distributing approximately eighty-five grams of marijuana, and count four with distributing approximately 110 grams of marijuana.

The Gahagans filed a motion to suppress the evidence and a motion in limine on June 25, 1987. A second motion in limine was also filed on July 13, 1987. Soper joined in the motions and also filed a motion to sever. [District Judge James P. Churchill] heard testimony and oral arguments on the motions on July

29 and July 30, 1987. [Judge Churchill] denied the motion to suppress the evidence and granted in part and denied in part the motions in limine. After denying the motion to suppress, [Judge Churchill] acknowledged the closeness of the issues and suggested the possibility of a conditional plea.

Subsequent to the court's rulings, the three defendants entered guilty pleas while reserving their rights for appeal pursuant to Rule 11(a)(2).... The Gahagans pled guilty to count seven of the indictment and each was sentenced to a two-year term of imprisonment, followed by a two-year special parole term. Susan Soper entered a plea of guilty to a superseding information and was sentenced to a sixty-day term of imprisonment. [The three individuals filed a notice of appeal of their sentence and conviction].

Prior to the search in September of 1986, the defendants were under an investigation initiated by Jerry Boerema, an investigator for Otsego County Prosecutor's Office, for a period of approximately nine months. During that period, an informant[, Roger Dale Byars,] allegedly made three separate purchases of illegal narcotics under Boerema's supervision ("controlled buys") at a Gahagan residence in January, February, and March of 1986. In September of 1986 and shortly before the search of the Gahagan residence, Boerema contacted the Drug Enforcement and Administration ("DEA") office in Saginaw, Michigan and requested assistance from the DEA. Michael Vetter, a DEA agent, was assigned to the case.

On September 12, 1986, [Byars] made a fourth controlled buy from the Gahagans. Thereafter, Agent Vetter sought a federal search warrant from Judge William Porter, a circuit court judge in the State of Michigan. Judge Porter issued the warrant based upon the affidavit of Michael Vetter, which was based upon Jerry Boerema's nine month investigation.

The warrant itself listed the premises to be searched as 7609 Douglas Lake Road, Johannesburg, Michigan. Vetter's affidavit described the premises for which the warrant was sought as

> 7609 Douglas Lake Road, Charleton Township, Otsego County, Johannesburg, Michigan, three story wood frame house with natural wood siding with an unattached four-car garage with natural color siding. Also located on the property is a single story wood frame log cabin-type structure painted dark brown in color. Also located on the property is a small wood frame shed-type building with a metal roof.

Vetter's affidavit incorporated a second affidavit, a multipage document, which set out in detail the investigation, the controlled buys, and facts upon which the officers believed established probable cause.

Vetter used a printed affidavit form calling for a recitation of the grounds for the search and seizure and the facts that established the grounds for the issuance of the search warrant. That recitation was accomplished by the attached and incorporated second affidavit which was seven pages in length and contained thirty-six separate paragraphs of information. The affidavit established that a confidential informant had purchased controlled substances, marijuana and its derivatives, from the Gahagans over a six-year period and that three controlled purchases of marijuana were made at the property known as 7609 Douglas Lake Road on January 29, 1986, February 12, 1986 and March 20, 1986. The affidavit also established that Officer Boerema advised Vetter that the

confidential informant had been informed by the Gahagans that narcotics were kept in different locations upon and about the property located at 7609 Douglas Lake Road. The affidavit also established that when controlled substances were purchased from the Gahagans, they would often take place in a one-story wood frame cabin and the Gahagans would obtain the marijuana from other locations on the property. The information in the affidavit also established that the Gahagans engaged in a detailed accounting of the purchases made on a cash basis and a credit basis and recorded such transactions in a separate ledger. The affidavit also set out the factual details regarding the controlled buy on September 12, 1986, the day of the search. The affidavit established that the affiant, Vetter, was in contact with the confidential informant before and after the controlled buy. Officer Vetter searched the confidential informant and his vehicle for controlled substances prior to the controlled buy. Officer Vetter then gave the informant government funds that were pre-marked with instructions to drive his vehicle to 7609 Douglas Lake Road and purchase marijuana from the Gahagans. Officer Vetter kept the confidential informant under direct surveillance and observed the informant drive into and enter the property known as 7609 Douglas Lake Road. Officer Vetter and other law enforcement officials observed the confidential informant exit the property of 7609 Douglas Lake Road and was kept under surveillance until a predetermined meeting place was reached by the confidential informant. After receipt of the marijuana purchased by the confidential informant, another search of the confidential informant was conducted including the search of his vehicle. The confidential informant advised Officer Vetter that he did in fact drive to 7609 Douglas Lake Road, as directed, and exited his motor vehicle near the front door of the main dwelling at 7609 Douglas Lake Road. The confidential informant advised Officer Vetter that he entered the small cabin with Michael John Gahagan and thereafter purchased marijuana from both the Gahagans.

The search warrant was executed on . . . September 12, 1986. Vetter conducted a pre search briefing session for those officers who participated in the search and provided them a description of the premises to be searched. Boerema also assisted Vetter in the pre search briefing session and described the places to be searched. Vetter and Boerema instructed the officers that the place to be searched was Cabin # 3 and House B as they later became known.

The search led to the discovery of approximately 840 grams of marijuana and 311 grams of hashish. The search resulted in the discovery of $4000 in U.S. currency, including $700 in marked bills from the controlled buy which had been made earlier on September 12, 1986. Other items discovered as a result of the search included cocaine paraphernalia, a hand scale, a black and brown ledger book, a "dial-a-gram" scale, a forty-five pound capacity triple beam scale, and two calculators. A number of weapons also were discovered, including a loaded .22 caliber semi-automatic pistol, a loaded .44 caliber magnum revolver, a loaded .357 caliber six shot revolver, a loaded .20 gauge pump shotgun, and a .22 caliber six shot revolver. The bulk of the narcotics discovered were found in Cabin # 3 and the remaining narcotics and other items were found generally in House B.

The motion to suppress the evidence was based upon the claim that the warrant failed to particularly describe the place to be searched. Specifically, the

[defendants] asserted that the address of "7609 Douglas Lake Road" alone, was insufficient to include Cabin # 3. The [defendants] maintained that Cabin # 3 is a separate residence with its own address of 7577 Douglas Lake Road. The [defendants] did not raise the claim that the probable cause determination by the state court judge was deficient, but instead focused their arguments on the particularity requirement, and in the alternative, the argument that assuming the warrant was valid, the officers exceeded the scope of the warrant in their search.

. . .

[Judge Churchill] conducted a two-day evidentiary hearing on the motions. During the hearing, a detailed description of the physical lay-out of the area searched was developed. The general area at issue in this case is a rural, large piece of property with multiple dwellings and structures. It was developed at the hearing, that there were four separate dwellings located in the general area.... [T]he dwelling identified as "Cabin 3" was the principal residence of the defendant Daniel Gahagan at the time of the search. Cabin # 3's address is 7577 Douglas Lake Road. Cabin # 3 is a single story wood, cabin-type home. [Cabin # 3 is located on Parcel B. *See* Appendix to Opinion.] The defendants Michael Gahagan and Susan Soper resided in "House B." The address for House B is 7609 Douglas Lake Road. House B is a multi-story wood frame house with an unattached garage that was partially completed and under construction since 1981. Daniel Gahagan was a co-owner of House B. [House B is located on parcel D1. *See* Appendix to Opinion.] When the search warrant was executed, the three [defendants] were found in Cabin # 3.

A cabin identified as # 2 and the house identified as # 4 were not owned or occupied by any of the [defendants] at the time of the search. However, prior to May of 1986, Daniel Gahagan owned House # 4 and it was in this house that the first three controlled buys took place. In May of 1986 he sold the property to a third party. House # 4 is a multi-story wood frame house with a two-car unattached garage. The address for House # 4 is 7539 Douglas Lake Road. Cabin # 2 is a single story wood, cabin-type house located approximately one hundred yards north of House # 4. [House # 4 is located on parcel A. Cabin # 2 is not relevant to the civil forfeiture case].

Driveway # 1 was identified as a driveway that serviced House B, 7609 Douglas Lake Road. There was a dispute over whether Driveway # 1 extended through the foliage to Cabin # 3. The Gahagans claim that there was "a path" that extended along Driveway # 1 past House B to Cabin # 3. However, there was testimony from Agent Vetter, Detective Boerema, and a bulldozer operator who had done work for the Gahagans, that the actual driveway extended to Cabin # 3. Agent Vetter testified that he drove a full-size Bronco on the day of the search between House B and Cabin # 3 without using the four-wheel drive capability.

At one time, Driveway # 2 serviced House # 4 and branched off and also serviced Cabin # 3. When House # 4 was sold in 1986, it was agreed by Daniel Gahagan and the buyer that Driveway # 2 would no longer service Cabin # 3. A new driveway, Driveway # 3, was constructed to provide access to Cabin # 3. Driveway # 3, however, did not exist for the majority of the time the defendants were under investigation but was installed in August, 1986.

At the end of Driveway # 1, the address of 7609 Douglas Lake Road was posted

on a sign. The address of 7577, Cabin # 3, was posted at the end of Driveway# 2. The address of 7539, House # 4, was also posted at the end of Driveway # 2. There was no address posted at the end of Driveway # 3. There were no address markings on either House B or Cabin # 3.

At the time that Gahagan owned House # 4 a mailbox was at the end of Driveway# 2 and mail for House # 4, Cabin # 3, and House B were all received at that mailbox. After the sale of House # 4, the mailbox was moved to the end of Driveway # 1 and mail was received at that mailbox for both Cabin # 3 and House B. There was no mailbox at the end of Driveway # 3.

The [defendants'] particularity argument was based primarily on the fact that the address of 7609 Douglas Lake Road alone was insufficient to include Cabin # 3 which had its own address of 7577 given the officers' knowledge that the defendants had lived in at least three of the dwellings identified and that there were transactions that occurred in more than one house. Furthermore, the [defendants] argued that the affidavit which was relied upon by the judge could not be looked to for a further description of the property to be searched because the affidavit was neither attached nor specifically incorporated in the warrant.

The [defendants] also argued to the district court that the officers exceeded the scope of the warrant when they executed the warrant. They argued that the officers should have concluded that they were outside the scope of the warrant when they arrived at House B and discovered more than one dwelling. They argued that a reasonable pre-search investigation would have revealed the fact that Cabin # 3 was a separate residence apart from House B . . . . The [defendants] attempted to underscore Daniel Gahagan's testimony that when he read

the warrant after he was served with it, he told the executing officers that they had the wrong address for a search of Cabin # 3.

*Gahagan*, 865 F.2d at 1491–94 (citations and footnotes omitted).

As mentioned, Judge Churchill ruled from the bench and denied the motions to suppress the evidence. The Sixth Circuit affirmed finding that the search of the property was proper, although the search warrant did not include the specific addresses to the property. *See id.*

The forfeiture proceedings have generated additional evidence, which the government sets forth in its affidavits, depositions and documentary evidence. Although the claimants dispute some of the facts, they offer no evidence and provide no citations to the record to support their contentions, as explained in more detail below. The government has proceeded on two independent theories of forfeiture suggested by 21 U.S.C. § 881(a). One theory calls for forfeiture of any real property that is used to facilitate the commission of a drug crime. *See* 21 U.S.C. § 881(a)(7). The other theory is based on the premise that the real estate was acquired with drug sale proceeds. *See* 21 U.S.C. § 881(a)(6).

### 1. Facilitation theory

The government points to the testimony of informant Roger Dale Byars, who had been renting a cabin from the Gahagans. Byars decided to become an informant after Michael Gahagan allegedly "turned him in" for stealing a motorcycle. Gov't's Mot. S.J. Ex. D, Byars dep. at 9. Byars' first "controlled buy" was in January 1986. At that time, he purchased marijuana and hashish from Michael Gahagan while Michael was living at House # 4 on Parcel A. *Id.* at 19. Byars made several other controlled buys from Michael at House # 4 throughout the year. He testified at his deposition that he purchased "illegal

drugs" from the Gahagans at House B, on Parcel A and B, and he testified that he saw illegal drugs stored on Parcel D, and in his last controlled buy in September 1986, Byars went to purchase marijuana from Michael at House B; however, he did not find anyone at House B so he went to Cabin # 3. *Id.* at 24–29. At Cabin # 3 he found Michael Gahagan and purchased "drugs" from him. *Id.* at 29.

Byars testified that Michael Gahagan kept a black ledger book in which was recorded Byars' indebtedness for past drug purchases and that Byars had seen the ledger book in House # 4, in Cabin # 3, and in House B. *Id.* at 29–30. The ledger book was seized during the execution of the search warrant. Vetter Test. at Grand Jury, Gov't Ex. H at 23–24. Byars also testified that his sister would leave his cabin with nothing in her hands and come back with drugs and that he assumed she was buying drugs from Michael Gahagan. *Id.* at 62.

In 1983, Susan Soper moved to Douglas Lake and rented House # 4 on parcel A from Agnes Gahagan. Gov't E. I, Soper dep. at 3, 77–78, 102. Soper testified at her deposition that Michael Gahagan stored marijuana, a triple beam scale, and "baggies" in the basement of House # 4 while Soper was living there and that only Daniel and Michael had access to the marijuana and paraphernalia in the basement. *Id.* at 36. Soper observed the marijuana, at times contained in a 20 gallon garbage bag, on several different occasions while she was living on the Gahagans' property. *Id.* at 36, 43.

In the summer of 1984, Soper began an intimate relationship with Michael Gahagan and the two lived together for a while in House # 4 and then eventually moved to House B on parcel D. *Id.* at 82–86, 102. Daniel Gahagan also apparently lived in House # 4 for a while, *see id.* at 36, then moved into Cabin # 3. In May 1986, the Gahagans sold House # 4 to a man named Roberts. *See* Gov't Ex. N., Testimony of Daniel Gahagan at Suppression Hearing, at 229. As a result, Daniel Gahagan moved the marijuana from House # 4 to Cabin # 3. *Id.* at 102–03. Soper also testified that she saw a marijuana plant growing in the garden behind Cabin # 3. *Id.* at 103. This testimony is corroborated by the now deceased Ben Taskey, a bulldozer operator who did construction work for the Gahagans, who allegedly told Bailey Sides, another building contractor for the Gahagans, that he saw marijuana growing in the garden at Cabin # 3. Gov't Ex. K, aff. of Bailey Sides at ¶ 5. Marijuana and drug paraphernalia were seized in Cabin # 3 during the search. Gov't Ex. J., Boerema dep. at 20–22; Gov't Ex. E, Vetter dep. at 12–13.

As discussed above, until August 1986, there was no roadway going directly from Douglas Lake Road to Cabin # 3. Instead, one had to access Driveway # 2, or Driveway # 1 to reach Cabin # 3. *See* Gov't Ex. A; Gov't Ex. I, Soper dep. at 99 The government claims, and the evidence appears to support, that between the time House # 4 was sold in May 1986 to August 1986 when Driveway # 3 was built, the only way the Gahagans or anybody else could reach Cabin # 3, where the drugs were stored, was to pass across parcel C along the two track road from House B. As discussed above, Mr. Roberts blocked the road from House # 4 to Cabin # 3 after he purchased House # 4. *See* Gov't Ex. N at 245–46. Of course, Parcel B and Cabin # 3 could have been reached by going across the water from Parcel D, *see* Gov't Ex. S at 119–22, 128–29, but this route seems highly unlikely given the distance between the property and the difficulty in crossing water versus using a common road. Moreover, the claimants never specifically allege that they took an amphibi-

ous route to Cabin # 3 from House B. The government contends that although no controlled buys occurred between May and August 1986, per the deposition testimony of Byars and Soper, uncontrolled transactions were conducted during that summer, which were facilitated by the access to Cabin # 3 made possible by Parcel C. Thus, the government argues that Parcel C was used to facilitate drug transactions.

As for the government's facilitation theory for Parcel D, including House B and the adjacent four-car garage, the government contends that the evidence of facilitation on these parcels goes beyond just providing access to Cabin # 3, where the drugs were stored. Instead, the evidence clearly shows that House B and the land were used for drug transactions. Bailey Sides, who built the garage for the Gahagans during the summer 1986, testified that he observed activities at House B which caused him to believe that Michael and Daniel were engaged in drug trafficking there. Sides stated that the Gahagans would have between seven or eight visitors each day, the visitors appeared to be between 18 and 25 years old, and stayed only about 20 minutes. Gov't Ex. K, aff. of Sides at ¶¶ 6–9. Sides also stated that Michael Gahagan told him that the second story of the garage he was building needed a gambrel roof so that a greenhouse could be built there. Id. at ¶ 6. The government alleges that the Gahagans were planning on using the greenhouse to grow marijuana because the Gahagans had a sizeable collection of marijuana seeds and there is no rational purpose for keeping marijuana seeds other than to grow marijuana. In addition, the government alleges that House B had "secret" rooms, which, the government claims, could be used to store narcotics. The government argues, therefore, that the record supports its contention that Parcel D was used to facilitate drug trafficking.

## 2. Proceeds theory

The government alleges that Parcel D was purchased, at least in part, with proceeds from the claimants' drug trafficking. In 1975, Agnes Gahagan bought 66 acres of land on Douglas Lake from Erma Brackenstose, including what is now referred to as Parcel D. Later that year Agnes transferred her interest in the land to her sons, Michael and Daniel Gahagan, as joint tenants. Gov.'t Ex. S, Brackenstose Testimony at Suppression Hearing at 119–21. Thereafter, Michael and Daniel began sending the payments on the property to Ms. Brackenstose, which are commonly referred to in this case as the "land contract payments." Id. at 121. On November 2, 1987, a warranty deed was issued by Ms. Brackenstose to Michael and Daniel showing that the land had been paid in full for the price of $55,000.00. Gov't Ex. T. At her deposition, Ms. Soper testified that she sent Ms. Brackenstose checks from her checking account each month to pay for the property and that Michael Gahagan would reimburse her for the money she had sent. Soper further testified that in her belief Michael Gahagan got the money to pay for the property from selling marijuana. Gov't Ex. I, Soper dep. at 29–30, 44–45.

The government also points to the luxurious nature of House B, which had, among other things, six natural stone fireplaces, a built in hot-tub and saunas, oak stairways, central heat, air, and vacuum, and a copper roof, see Gov't Ex. O at 13–16; Gov't Ex. H at 15, 20, and the fact that neither Daniel or Michael Gahagan apparently had any legitimate income. Although Michael Gahagan told police that he was employed as a painter, Soper testified that she only saw Michael Gahagan go to work to paint a house on two occasions, see Gov't Ex. I, Soper dep. at 103–04, and Daniel Gahagan stated after his arrest that his occupation

was building his own house. *See* Gov't Ex. H at 24. Moreover, neither brother filed a federal income tax return for the years 1974 through 1986. *See* Gov't Ex. V. Therefore, the government contends that the record is devoid of any significant, legitimate income for Daniel and Michael Gahagan during the time frame in which they were buying Parcel D from Ms. Brackenstose, building House B, and the two-story, four car garage adjacent to the house. Accordingly, the government maintains that the only means the Gahagans had to pay for Parcel D and the property on it was from the proceeds of their drug trafficking.

### B. Procedural history

On November 12, 1987, after Michael and Daniel Gahagan had been sentenced in the criminal case, the government initiated a civil action *in rem* under 21 U.S.C. § 881(a) by filing a verified complaint of forfeiture in this Court for the forfeiture of various parcels of property owned by the Gahagans that allegedly were used to facilitate a violation of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, or were paid for by proceeds from the Gahagans' illegal drug activity. The claimants requested, and Judge Churchill granted, a motion to stay the civil forfeiture case pending the claimants' direct appeals of their conviction and sentence. After the Sixth Circuit rendered its decision affirming the district court in the criminal case, the stay was lifted and a long and contentious period of discovery and motion practice ensued. The issues were narrowed in a series of dispositive motions. On October 29, 1993, Judge Churchill, in a memorandum opinion, ruled that probable cause existed to forfeit Parcels A, B, C and D. In an order dated October 31, 1997, Judge Cleland rejected the claimants' defenses to forfeiture and found that the claimants "failed to meet their burden of proof, the government is entitled to forfeiture of parcels C and D pursuant to 21 U.S.C.

§ 881(a)(7) and of the land contract payments made on parcel D since mid–1984 pursuant to 21 U.S.C. § 881(a)(6)." Dkt. # 609.

On September 30, 1998, Judge Cleland held a hearing on Agnes Riddle–Gahagan's claim that the mortgage granted to her on Parcel D by her son, Daniel, should be superior to the government's interest because she was an innocent owner. The following are excerpts from the hearing transcript, which are relevant here:

> THE COURT: This is the time set by the court for the opportunity to present evidence on the question of innocent ownership claims advanced by the claimant Agnes Gahagan. I believe that all other issues in the case, with this exception, have been resolved by earlier orders of the court.
>
> The posture of the case, I think, Mr. Wackerly [Agnes' attorney], would call upon the claimant to carry a burden, at a minimum, the burden of going forward and probably a burden of proof with respect to whatever is required to establish innocent ownership status and focused upon the remaining parcel or portion of the parcel identified in the file. Are you in accord on those issues?
>
> MR. WACKERLY: Your Honor, it's my understanding that the case law requires the claimant to move forward and places on her a burden of preponderance of the evidence, that's my understanding.
>
> THE COURT: Very good. I think the parcel that we're focused on is parcel D–1, are you in agreement on that?
>
> MR. WACKERLY: I am in agreement on that, that is correct.
>
> THE COURT: Very good. So on parcel D–1 the claimant has the burden of coming forward with evidence and

802

the burden of persuasion by a preponderance.

Gov't Ex. R at 2–3.

After a discussion with the attorney for the government, the court concluded that the rules of evidence applied to the hearing on Agnes Gahagan's innocent owner defense. *Id.* at 11. Mr. Wackerly, Agnes' attorney, then gave the following opening statement:

Thank you. Your Honor, what I will be presenting today is very limited. I'll be presenting only the testimony of Agnes Gahagan, and that testimony will be limited to what I believe is the time period in question which is 1986 and 1987. I will show that at that time she did not live on the property in question and that she lived at a place called Little Bear Lake which was close to the property in question, but not on the property in question.

We will show that it was her understanding that Michael Gahagan and Daniel Gahagan were living in a house that was located on what we have come to know as either parcel A or B. No one was living in parcel D at the time this even occurred.

Agnes Gahagan knew that the house was being erected on parcel [D][sic]. She also knew that a garage was being erected on parcel [D][sic]. In an effort to assist in the erection of the garage, she lent Michael and Daniel Gahagan the sum of $10,000 to build a garage.

After that occurred, she took a promissory note from Michael Gahagan and Susan Soper, I believe for an automobile that she had, in the amount of $2,500. And shortly after that, I do believe within days, the property was searched by the federal government and Michael Gahagan and Daniel Gahagan were arrested.

After that time period, she began to lend money to Michael Gahagan, Daniel Ga-

hagan and also to Michael and Daniel on behalf of Susan Soper so that they could pay their attorney fees.

She was advised by counsel that she could obtain a mortgage to secure prepayment. She obtained a mortgage from Michael and Daniel. The mortgage covered parcels D–1, relevant parcels D–1 and E–1, and the mortgage was in the amount of $20,000.

At that time she had advanced for the garage, the car, and attorney fees approximately the amount of $18,500. Within days after taking the note and mortgage, she also advanced the sum of $2,000, taking it over the $20,000 sum for the mortgage note. When Agnes Gahagan did that, she had no idea that criminal activity had taken place on D–1 and E–1. In fact, she believed that the house which—on the various diagrams I think—has been given a designation as house B was unoccupied.

It was her belief that the boys were living on the northern properties which would be on parcels A and B.

She took a mortgage on D–1 and E–1 having no idea that property was subject to forfeiture; didn't even know what forfeiture was at that time. Didn't have any idea that criminal activity had taken place there. As a matter of fact, shortly before forfeiture action was taken, and we believe this will again show her innocent ownership, she paid the taxes on parcel D–1 and E–1.

Basically what we intend to show is that she had no knowledge that property was used for any criminal activity, and that she took the mortgage in good faith to secure monies that she was giving to her sons Michael and Daniel Gahagan.

*Id.* at 14–16.

Agnes Gahagan then testified and was cross-examined by the attorney for the government. After Agnes testified, the

government called Michael Vetter, who was working as a Drug Enforcement Agency agent at the time of Michael and Daniel Gahagan's arrest, as a witness to testify about events surrounding the government's investigation of the Gahagans. Mr. Vetter was also cross-examined. After closing arguments, the court ruled as follows:

All right. Well the testimony has been received, exhibits have been reviewed, and I take into account the pleadings, proffers of counsel, their arguments, and I think I have enough to rule on the issue with respect to this parcel D and the mortgage interest held by Agnes Ridell Gahagan.

. . .

Now I don't for any other reason discount her credibility or find her less than rationally credible, and in that regard I accept her testimony that she did not have personal knowledge before the time of the search and the arrest that her sons were then engaged in drug traffic going [sic]. I accept her testimony that she did not have any knowledge before the time of the arrest and the search that any of this property was used for drug trafficking.

Though as counsel has stipulated, as it turns out, it is clear that the large house, the new house sometimes called the duplex [House B], was used, or apparently so at least, for drying marijuana, for storage of a triple beam scale, which I take notice is used in weighing larger quantities of drugs and is a tool of the trade of a drug packager or distributor. So certainly there are reasons to underpin the government's interest in that property.

The question really, it seems to me, is what her state of knowledge was, not at the time of the search but at the time of the July 31 mortgage. And on this I accept a combination of her testimony and the timing of the various events.

I keep in mind here it's the responsibility of the claimant to prove by a preponderance of the evidence that she did not have knowledge of the illegal goings on on the property subject to forfeiture at the time she took the mortgage interest.

Her knowledge at the time of the search and the arrest, I think, is one thing. But even more important is her knowledge and her state of mind as of the 31st of July, 1987 when the mortgage interest was formulated.

And as of that time, I find that Mrs. Gahagan has not proven by a preponderance of the evidence that she was without knowledge of the illegality associated with that parcel on which she took the mortgage interest.

Too much water had passed under the bridge concerning which she was aware, or about which she was aware by that time. There had been extensive court proceedings, though she had been gone—I think they said—Hawaii. And I accept that for the preceding winter, but by her own statements she was back in May or thereabouts, back to Michigan, living in the lake country. And that's certainly understandable, May, June, July—June, July and August being the prime months in that territory, I'm sure.

But by that time, the criminal cases were, in fact, winding to a close, and all of these funds were being paid out with her assistance, which is, I find, understandable; assistance from a mother to her sons financially.

But the suppression hearing, as Miss Parker points out, the timing of that as compared to the taking of the mortgage is just very telling I think. It is clear that it indicates a high degree of awareness and knowledge on her part which she may not now clearly recollect, but

which I find borne by the comparison of one date as next to another.

As I said in my introductory comments before the attorneys spoke, the timing of the events and the sequence of events raises suspicion.

. . .

My conclusion is that the claimant has not proven by a preponderance of the evidence the innocent state of mind that would be required for an innocent owner defense to succeed here.

And I do not need to make any comparative credibility determinations beyond those that I have already noted.

I note, in addition, that there's some evidence certainly in support of her point of view, but some evidence does not translate to evidence that persuades by a preponderance of the evidence. All of that is taken into account.

*Id.* at 111–115. The court entered an order denying Agnes Gahagan's innocent ownership defense on September 30, 1998 and a judgment was entered for the government on that same day. The order and judgment dismissed the case in its entirety.

The three claimants appealed the adverse rulings. On March 1, 2001, the Sixth Circuit reversed Judge Cleland's decision granting summary judgment for the government on Parcels C and D and remanded the case to this Court with the instruction that the Court should conduct further proceedings applying CAFRA. Although the Sixth Circuit's opinion did not reverse Judge Cleland's ruling that Agnes Gahagan was not an innocent owner of Parcel D1, the court did note that Judge Cleland had "rejected Agnes Gahagan's innocent owner defense and found that the mortgage she held on parcel D should not bar forfeiture." *Real Property in Otsego County, Mich.*, 241 F.3d at 797.

On June 28, 2001, this Court reopened the case and on September 10, 2001 a status conference was held with the parties. On September 17, 2001, the Court entered an order setting deadlines for filing motions for November 13, 2001. The Court later granted the government's motion for an extension of time to file its summary judgment motion. The government filed its motion for summary judgment on December 12, 2001, the claimant's filed a response in opposition on January 17, 2002, and the government filed a reply on January 30, 2002. The claimants filed their motion for summary judgment on December 27, 2001, the government filed a response in opposition on January 18, 2002, and the claimants filed a reply on February 6, 2002. Argument was presented by the government and Daniel Gahagan on December 22, 2003.

## II. Summary judgment motions

### A. Review standards

As previously mentioned, the government and the claimants each have moved for summary judgment. A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143,

1148 (6th Cir.1994) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 943 (6th Cir.2000). When the "record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine issue of material fact. *Simmons–Harris v. Zelman,* 234 F.3d 945, 951 (6th Cir.2000). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment that is properly supported. *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir.1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Univ., Inc.,* 276 F.3d 845, 848 (6th Cir.2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.,* 936 F.2d 889, 895 (6th Cir.1991).

"The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records,* 329 F.3d 437, 444 (6th Cir.2003). Thus, when this Court evaluates cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.,* 336 F.3d 503, 506–07 (6th Cir.2003).

These standards are applicable when deciding a summary judgment motion in a forfeiture action. *United States v. $5000.00 in U.S. Currency,* 40 F.3d 846, 848 (6th Cir.1994).

### B. Applicable law

The civil forfeiture provision of the Controlled Substances Act provides, in pertinent part:

The following shall be subject to forfeiture to the United States and no property right shall exist in them:

. . .

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

(7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment.

21 U.S.C. § 881(a)(6) and (7). Section 881(a)(6) supports the so-called "proceeds theory" of forfeiture and Section 881(a)(7) constitutes the "facilitation theory."

▉ Before CAFRA, the government had the initial burden of demonstrating that the property was subject to forfeiture. To meet this burden, the government was required to "establish probable cause to believe that a substantial connection exists between the property to be forfeited and the illegal exchange of a controlled substance." *United States v. $67,220.00 in United States Currency*, 957 F.2d 280, 283 (6th Cir.1992) (quotation omitted). The claimant then was required to come forward with a higher order of proof than required of the government—by a preponderance of evidence—to defeat a forfeiture claim. With the passage of CAFRA, the government's burden is heightened. Now the government is required to establish by a preponderance of the evidence that the property is subject to forfeiture. 18 U.S.C. § 983(c)(1). The statute provides the following:

In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property—

(1) the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture;

(2) the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a prepon-

derance of the evidence, that property is subject to forfeiture; and

(3) if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.

18 U.S.C. § 983(c). Therefore, the government must still establish a substantial connection that the property at issue is subject to forfeiture; however, it must do so by a preponderance of the evidence, not merely by "probable cause." Pursuant to *Real Property in Otsego County, Mich.*, 241 F.3d at 798, CAFRA applies to this case.

"The burden of showing something by a 'preponderance of the evidence,' the most common standard in the civil law, 'simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." ' " *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (quoting *In re Winship*, 397 U.S. 358, 371–72, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)). For the government to prevail on its motion for summary judgment, it must persuade the Court that the undisputed facts, while drawing all reasonable inferences in favor of the claimants, establish a substantial connection by a preponderance of the evidence between Parcels C1, D1 and D3 and the drug trafficking crimes alleged, and that no defenses can be proven. For the claimants to prevail on their motions, they must show that the undisputed facts viewed in the light most favor-

able to the government demonstrate that no substantial connection can be proven, or that the claimants' defenses are established as a matter of law.

### C. Analysis as to claimants Daniel and Michael Gahagan

The Court finds that the government has shown by the preponderance of the evidence that the property at issue in this case is subject to forfeiture. *See United States v. $99,990.00 in United States Currency,* 69 Fed.Appx. 757, 762–63 (6th Cir. 2003) (unpublished) (finding that the government had demonstrated by a preponderance of the evidence that property was subject to forfeiture because of the large amount of cash the claimant had in his possession, coupled with the totality of the circumstances of the claimant's drug activity and the fact that the claimant's evidence of legitimate income did not sufficiently explain his possession of $99,900). *See also United States v. Six Negotiable Checks in Various Denominations Totaling One Hundred Ninety One Thousand Six Hundred Seventy One Dollars and Sixty Nine Cents ($191,671.69),* 207 F.Supp.2d 677, 683 (E.D.Mich.2002) (Rosen, J.) (holding that the government established by a preponderance of the evidence that property at issue was subject to forfeiture).

■ With respect to Parcel D under the facilitation theory, Byars testified at his deposition that he purchased narcotics from the Gahagans at House B on Parcel D and saw illegal drugs stored on Parcel D. Gov't Mot. S.J. Ex. D, dep. of Byars at 33–37. In his last controlled buy, Byars initially went to House B to purchase drugs, indicating that drugs were likely stored there. He saw Michael's ledger book, which Michael used to facilitate his drug trafficking, at House B. Bailey Sides stated that he saw what appeared to be drug activity occurring at House B. Gov't Ex. K, aff. of Sides at ¶¶ 6–9. Sides also

stated that the Gahagans were attempting to build a greenhouse above the garage and the government found a large supply of marijuana seeds in the Gahagans' possession. A triple beam scale was also found at House B, which supported the inference that drug transactions occurred there. Finally, it is appears to be undisputed that between May 1986 and August 1986, the only access the Gahagans had from Douglas Lake Road to Parcel B, where the evidence establishes that the bulk of the narcotics were stored, was across Parcel D. Thus, the government has established by a preponderance of the evidence that Parcels D1 and D3 are subject to forfeiture under the facilitation theory set forth in 21 U.S.C. § 881(a)(7).

. With respect to Parcel D and the proceeds theory, the government has offered the direct evidence that some interests in Parcel D are proceeds from the Gahagans' drug sales. Susan Soper disclosed in her deposition testimony that at the time she was living with Michael Gahagan, she would, on more than one occasion, make land contract payments to Erma Brackenstose from the money received from drug sales. Gov't Ex. I, Soper dep. at 29–30, 44–45. The Gahagans have failed to rebut this testimony with evidence that the land contract payments were made with legitimate income. Although they state that they were working during this period and earning a salary, the Gahagans have not provided the Court with pay stubs or other documented proof that would support their contentions. It is more likely than not, therefore, that the proceeds used to pay for the property and to construct and furnish House B on Parcel D were derived from illegal drug sales. *See United States v. Thomas,* 913 F.2d 1111, 1115 (4th Cir.1990) (finding that because undisputed cash expenditures vastly exceeded the defendant's legitimate income, the government had probable cause for forfei-

ture); *United States v. Dusenbery*, 80 F.Supp.2d 744, 754 (N.D.Ohio 1998) (holding that "the absence of legitimate income supports the finding of probable cause in a forfeiture action") (citing *United States v. Brock*, 747 F.2d 761, 763 (D.C.Cir.1984)). Accordingly, the government has established, by a preponderance of the evidence, that Parcel D is subject to forfeiture under the proceeds theory, 21 U.S.C. § 881(a)(6).

The government has not carried its burden with respect to Parcel C under the proceeds theory. Nor is there is any relevant or credible direct evidence of the use of Parcel C to facilitate a drug transaction. There is, however, circumstantial evidence that supports the facilitation theory. Judge Churchill found: "The record clearly establishes that Parcel B and D were used to facilitate drug transactions. Michael Gahagan was selling drugs on Parcel B while he was living on Parcel D. The most direct, convenient and private route between Parcels B and D is across Parcel C. These facts, when considered with the testimony of the officers who conducted the search, provide convincing circumstantial evidence of probable cause to believe that Parcel C was used as a frequent route of travel between Parcels B and D to facilitate the distribution of controlled substances." *See* dkt. # 403 at 18. The Court believes that these observations establish that it is more likely than not that Parcel C was used as a means of egress between Parcels B and D and thereby facilitated the drug trafficking activity that Judge Churchill described. The claimants have not come forward with contrary evidence, nor do they point to circumstances giving rise to a factual dispute. Thus, the government has met its burden of proof to forfeit Parcel C under the facilitation theory set forth in 21 U.S.C. § 881(a)(7).

■ The claimants argue that the mere fact Parcel C provided a "means of access" to Parcel B where the drugs were stored does not establish a substantial connection to drug trafficking, citing *United States v. Two Tracts of Real Property With Bldgs., Appurtenances and Improvements Thereto, Located in Carteret County, N.C.*, 998 F.2d 204 (4th Cir.1993), in support. In that case, the court held that the property could not be forfeited by the government because it's only connection with drug trafficking consisted of the furnishing of a quasi-easement over which drug smugglers hauled contraband. Moreover, the culpable person had no legal interest in the property and the mere fact that the land provided a "means of access" by which contraband reached the public highway did not establish a "substantial connection." *Id.* at 206. The plaintiff's reliance on this case is misplaced; there is no dispute that the Gahagans have a legal interest in Parcel C and there was no "quasi-easement" over the property that allowed the Gahagans to move from Parcel D to B. Rather, the claimants have not come forth with any evidentiary showing contemplated by Rule 56(e) to dispel the inference that it is more likely than not that Parcel C was used as a means of access to the supply of drugs stored on the property away from Gahagan's residence on Parcel B.

Next, the claimants argue that the Court should not consider Susan Soper's testimony that land contract payments were made from drug proceeds because she later recanted this testimony. In support of this argument, the claimants cite to "Exhibit 8, Letter of Corrections." The government has moved to strike Exhibit 8, which is entitled "synopsis of Susan Soper deposition with corrections," because it is unsworn and therefore not within the class of materials that may be considered pursuant to Federal Rule of Civil Procedure 56(e). Rule 56(e) requires that documentation supporting a summary judgment motion or response consist of "affidavits [that] shall be made on personal knowledge, shall set

forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). The claimants' Exhibit 8 does not measure up to this requirement and therefore is inadequate to create a genuine fact issue that would defeat summary judgment.

The claimants also argue that the government erroneously is mounting an *"in personam"* attack on the claimants when it should be focused on the *"in rem"* defendant. This argument might be considered somewhat puzzling until one reads Judge Churchill's August 28, 1992 Memorandum Opinion found at dkt. # 403. In that opinion, Judge Churchill rejected the government's argument that it was entitled to claim the proceeds from the sale of the personal property and portions of the real estate because there was "no statutory authority for seizure of proceeds of the sale of property because it was used to facilitate the distribution of a controlled substance." Dkt # 403 at 9. Judge Churchill reasoned that "[e]ven if there was a legal basis for seizing the proceeds of the sales of the identified parcels .... a judgment for the proceeds of sale would be enforceable only ... if the judgment was treated as a judgment *in personam* against the claimant who is identified as the seller in the complaint." *Ibid.* (emphasis in original). Judge Churchill concluded that the court only had control over the "res" in an *in rem* forfeiture proceeding and, therefore, the government's prayer for relief was not consistent with the nature of an *in rem* proceeding.

The claimants have conflated this holding with their belief that the government cannot consider the claimants' activity on the land in this civil forfeiture action. This is clearly not the case and Judge Churchill's opinion does not provide any support for that theory.

■ Next, the claimants contend that allowing the government to use evidence of the claimants' criminal case against them will violate the Double Jeopardy Clause. This issue has already been decided by Judge Cleland in an order dated October 31, 1997. *See* dkt. # 609. In that order, Judge Cleland correctly stated that *"in rem* forfeiture proceedings are 'neither "punishment" nor criminal for purposes of the Double Jeopardy Clause.' " *Id.* at 11 (quoting *United States v. Ursery,* 518 U.S. 267, 274, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996)). Judge Cleland held that "[t]he current forfeiture action is distinct from the criminal prosecution in that it is against the property and not against the claimants. The property in this case has not been prosecuted for the instances at issue here." *Id.* at 11–12. That holding was undisturbed by the court of appeals, and the Court agrees with it. Accordingly, the claimants' argument is without merit.

However, the claimants argue that the Sixth Circuit made it clear at oral argument that all of the claimants' issues are preserved and are part of the remand. The claimants, however, did not provide the Court with a copy of the oral argument transcript and the mandate from the Sixth Circuit did not so indicate. This argument is baseless.

The claimants argue that they were never allowed the opportunity to confront witnesses whose testimony the government now seeks to use against them. This is incorrect as the claimants were allowed to cross-examine the witnesses during their deposition testimonies and during various hearings in this case and the underlying criminal case. The argument is not pertinent at the summary judgment stage of proceedings where much of the evidentiary material is typically presented to the court in affidavits. It is the obligation of the claimants, as the parties opposing the mo-

tion, to come forward with sworn (and possibly uncross-examined) testimony of their own that demonstrates a genuinely disputed issue of material fact.

Addressing the government's "proceeds" theory, the claimants argue that despite the government's contention, they did have legitimate income and it was from this income that they made the payments on the land contract. The claimants also state that Judge Churchill found that they had legitimate income. The claimants fail to cite to the portion of the record where Judge Churchill found that they had legitimate income; the Court has found no statement from Judge Churchill to that effect. Moreover, the claimants offer nothing but their own self-serving statements to support this argument. They have offered no pay stubs, the income tax returns, receipts for the painting supplies they purchased, testimony from the individuals whose houses they painted, or any other evidence that readily could be provided had the claimants in fact earned any legitimate income. Their allegations are unsupported and are inadequate to defeat summary judgment.

Next, the claimants state that Judge Churchill held that no controlled purchase took place on Parcel D. That is true, but that fact does not overcome the evidence that a triple beam scale was found on Parcel D, suspicious drug-like activity occurred there, and Byars testified that he observed drugs stored on Parcel D. Although the claimants refute Bailey Sides' testimony that individuals were going to House B to purchase narcotics by arguing that these individuals were contractors making bids to perform work on House B, this dispute alone will not defeat summary judgment because there is ample evidence in the record without Sides' testimony to establish that drug trafficking took place at House B.

Finally, the claimants resurrect the issue of mineral rights on the property, but that issue has already been decided by Judge Churchill, who concluded that if the surface rights were determined to be forfeitable, then the claimant's mineral rights would be forfeited as well. *See* dkt. # 499 at 3, 7.

The Court finds that the government has made the necessary showing for summary judgment in its favor under CAFRA, and the claimants have not come forward with competent evidence demonstrating a material fact issue. They certainly have not established that the government cannot prove its case under CAFRA. The Court will grant the government's motion for summary judgment as to Daniel and Michael Gahagan and deny the summary judgment motion by those claimants.

### D. Analysis as to claimant Agnes Riddle–Gahagan

The government argues that Agnes Gahagan can no longer assert a status as an innocent owner of a mortgage interest in Parcel D because her right to maintain an action to enforce the mortgage is barred by Michigan's statute of limitations set forth in Mich. Comp. Laws § 600.5807, which states that "the period of limitations is 10 years for actions founded upon covenants in deeds and mortgages of real estate." The government also points out that Judge Cleland found that Agnes Gahagan failed to show by a preponderance of the evidence that she was an innocent owner, and therefore the burden of proof prescribed by CAFRA has been employed. Finally, the government insists that principles of equity would require Agnes Gahagan to pursue of satisfaction of the underlying debt owed by her sons from the unforfeited collateral—Parcel E—which enjoys a value substantially in excess of the contractual obligation owed to this claimant.

Agnes Gahagan argues that because the government filed a *lis pendens* on Parcel D1 prohibiting its sale, the statute of limitations referenced by the government is tolled. She also points to Mich. Comp. Laws § 600.5803 ("no person shall bring ... an action ... to foreclose a mortgage on real estate unless he commences the action or proceeding within 15 years after the mortgage becomes due or within 15 years after the last payment was made on the mortgage") and Mich. Comp. Laws § 600.3175 (allowing an interested person after 15 years to bring an action to have a mortgage discharged if no payment has been made) in support of her argument that time remains on the statute of limitations to enforce the mortgage note, which was due on July 31, 1990. She also insists that Judge Churchill found her to be an innocent owner and that Judge Cleland's decision reversing Judge Churchill was erroneous and contrary to the law of the case. *See* dkt. # 516, Judge Churchill Order at 3. Finally, the claimant argues that the facts of this case demonstrate that she had no reason to believe Parcel D1 was used for illegal activity when she accepted the mortgage note. As a result, the claimant asks this Court to deny the government's motion and enter a judgment in her favor.

Under CAFRA, "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence." 18 U.S.C. § 983(d)(1). CAFRA also speaks to circumstances in which the claimant's interest in the property arose after the occurrence of the criminal activity:

> With respect to a property interest acquired after the conduct giving rise to the forfeiture has taken place, the term "innocent owner" means a person who, at the time that person acquired the interest in the property—(i) was a bona fide purchaser or seller for value (including a purchaser or seller of goods or services for value); and (ii) did not know and was reasonably without cause to believe that the property was subject to forfeiture.

18 U.S.C. § 983(d)(3)(A).

■ Contrary to the claimants' argument, Judge Churchill found that Agnes Gahagan was an innocent owner as to all parcels *except Parcel D. See* dkt. # 499 at 10 (stating that "[f]actual and legal issues with respect to the validity of Agnes Gahagan's mortgage on Parcel D are reserved for future determination"); dkt. # 516 at 3 (observing that "while Agnes Gahagan's mortgage is not subject to forfeiture, there may yet be in this suit an adjudication that, with respect to Parcel D, it is inferior to a title acquired by the government"). Agnes Gahagan already has had a full hearing in which she attempted, without success, to present her innocent owner defense with respect to her mortgagee's interest in Parcel D. Judge Cleland ruled against her by applying the same evidentiary standard as now mandated by CAFRA. Of course, a claimant need not prove innocent owner status or even assert such a defense if the government is unable to establish a right to forfeit the property, which, I believe, is the point of the court of appeals' opinion in this case insofar as Agnes Gahagan is concerned. The case was remanded to determine whether the government could establish a right to forfeit the property under the heightened standard of proof required by the new legislation. This Court has now found that the government has proven that the property is subject to forfeiture, and it sees no cause to relitigate the innocent owner defense.

This Court does not read the opinion of the court of appeals as limiting its authority to revisit Agnes Gahagan's innocent

owner defense. Rather, the Court believes it prudent to let stand the prior adjudication rendered after a full hearing, and view it as the law of the case. "[T]he law of the case doctrine merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (quotation and citation omitted). "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Ibid.* (quoting *Arizona v. California*, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)).

■ This Court finds no clear error in the determinations of the predecessor judges who have rendered decisions in this case. The Court, therefore, will apply the law of the case doctrine "to prevent the continued litigation of settled issues." *United States v. Todd,* 920 F.2d 399, 403 (6th Cir.1990). The Court finds that the government is entitled to summary judgment in its favor on the claims of Agnes Gahagan and that her innocent owner defense must be rejected as to Parcel D1 and D3. The government's right to forfeit Parcel D will not be subject to Agnes Gahagan's mortgage. The Court need not reach the statute of limitations arguments.

### III.  Daniel Gahagan's motion for release from arrest

On September 10, 2001, in year fourteen of this case, claimant Daniel Gahagan filed a *pro se* motion "for release from arrest" in which he argued that his Fifth Amendment due process rights were violated because he was not provided a hearing prior to the seizure of his property as required by *United States v. James Daniel Good Real Property,* 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993). Indeed, the Supreme Court has held that absent exigent circumstances, a property owner is entitled to a hearing under the Fifth Amendment's Due Process Clause before the government may seize real property. *Ibid.* "To establish exigent circumstances, the Government must show that less restrictive measures—i.e., a *lis pendens,* restraining order, or bond—would not suffice to protect the Government's interests in preventing the sale, destruction, or continued unlawful use of the real property." *Id.* at 62, 114 S.Ct. 492.

The record in this case indicates that at the time the United States Marshal originally posted the property as subject to seizure, the dwellings were vacant. The parties subsequently entered into a stipulation for occupancy, which required substantial revision when the principal custodians, Daniel and Michael Gahagan, began to serve their criminal sentences. In August 1989, Judge Churchill declared that the United States was the principal custodian but he permitted Agnes Gahagan a right of access, an arrangement that has continued through the litigation.

■ By the time this claimant filed his motion "for release from arrest," the merits of the forfeiture claims had been determined, the claimants' defenses for the most part were found wanting, and intervening legislation required a new assessment of the government's right to forfeit the property. That determination now has been made, and the question of whether a preseizure hearing is required has been rendered moot. Had the motion been made at the commencement of the proceedings, or eight years later when *James Daniel Good* was decided, the Court would have been presented with the opportunity to provide meaningful relief if appropriate.

However, the stipulation for occupancy and subsequent modifications to the order entered pursuant thereto served as the functional equivalent of the measures described by the Supreme Court ("*lis pendens*, restraining order, bond"). Moreover, Judge Churchill already determined that there existed probable cause to believe that the property was subject to forfeiture long before the motion was filed and well before the enactment of CAFRA. Although the probable cause standard no longer satisfies the government's ultimate burden to sustain a forfeiture complaint, it does meet the preliminary burden required by the Due Process Clause as set forth in *James Daniel Good. See United States v. Real Property Located at 1184 Drycreek Road, Granville, Ohio 43202,* 174 F.3d 720, 731 (6th Cir.1999). The Court concludes, therefore, that the motion "for release from arrest" should be denied.

#### IV. Daniel Gahagan's motion for summary judgment on suppression of evidence

Daniel Gahagan has also filed a motion for summary judgment on the theory that the government violated his right to a preseizure hearing under *James Daniel Good,* and he contends that all evidence discovered on the property must be suppressed and the forfeiture proceedings dismissed. He also insists that the government is accountable for damages in the form of lost rents and profits he could have made from contracting with an energy corporation to have oil and gas wells drilled on the land. The claimant provides the Court with a letter from Meridian Energy Corporation inquiring into whether or not the claimant is interested in having commercial wells placed on his land. Thus, the claimant contends, but for the government illegally seizing his property, he could have made a profit from the oil and gas wells, as evident by the letter of inquiry from the energy corporation.

The Court has already determined that action was taken as early as 1989 to address the possessory interest in the land during the forfeiture proceedings. On August 17, 1989, Judge Churchill, after providing the claimant with an adequate opportunity to be heard, rendered his decision that the government was the "principal custodian" over the property and thus the "seizure," if one occurred, was proper. The letter from Meridian Energy Corporation inquiring into whether or not the claimant is interested in having commercial oil and gas wells placed on his land is dated September 11, 1991. At that point, a probable cause determination had been made and the Due Process Clause was satisfied. The Court concludes that there is no merit to this motion and it will be denied.

#### V. Daniel Gahagan's motion for summary judgment under the Eighth Amendment

Daniel Gahagan has also filed a motion for summary judgment pursuant to the Excessive Fines clause of the Eighth Amendment, in which he argues that allowing the government to forfeit his property would constitute an excessive fine because the net worth of the land is 220,000 times the amount of the claimants fine, and 200 times the amount of the value of the seized drugs in this case. Thus, the claimant argues that he is entitled to a judgment as a matter of law that the property cannot be forfeited by the government because the forfeiture would offend the Eighth Amendment.

This identical argument was raised by Daniel and Michael Gahagan before Judge Cleland. On October 31, 1997, Judge Cleland ruled that the "claimants ... provided no evidence of the properties' value nor made any attempt to establish how forfeiture of any of these parcels of property

would be 'grossly disproportionate' or 'unconstitutionally harsh.'" Order, 10/31/97, dkt # 609 at 9 (citations omitted). Judge Cleland also stated that "it is difficult for the court to believe that the value of parcels C and D would exceed the potential $250,000.00 fines claimants each faced for their illegal actions." *Id.* at 10. Consequently, Judge Cleland rejected the claimants' Eight Amendment defense.

The Court finds no reason to revisit this ruling. The decision of the court of appeals never criticized or even addressed this aspect of Judge Cleland's ruling, and, as with the innocent owner determination, the Court will apply the law of the case doctrine "to prevent the continued litigation of settled issues." *Todd,* 920 F.2d at 403. The motion, therefore, will be denied.

## VI. Conclusion

The Court determines that there is no genuine issue of material fact on the question of the government's right to forfeit Parcels C1, D1, and D3. The government has established by a preponderance of the evidence that a substantial connection exists between these parcels of real estate and the illegal drug trafficking activity alleged. The claimants have not come forward with evidence in a form allowed by Federal Rule of Civil Procedure 56(e) that creates a genuine fact issue or establishes a defense to the forfeiture action as a matter of law. Agnes Gahagan's innocent owner defense already has been determined against her in prior proceedings in this case with respect to her mortgagee's interest in Parcel D. Daniel Gahagan's motions for release from arrest, for summary judgment on suppression of evidence, and for motion for summary judgment pursuant to the Excessive Fines clause of the Eighth Amendment all lack merit and will be denied.

Accordingly, it is **ORDERED** that the government's motion for summary judgment of forfeiture as to claimants Daniel and Michael Gahagan [dkt. # 709] is **GRANTED.**

It is further **ORDERED** that the government's motion for summary judgment of forfeiture as to claimant Agnes Riddle–Gahagan [dkt. # 711] is **GRANTED.**

It is further **ORDERED** that the motion for summary judgment by claimants Daniel and Michael Gahagan [dkt. # 713] is **DENIED.**

It is further **ORDERED** that the motion for summary judgment by claimant Agnes Riddle–Gahagan [dkt. # 713] is **DENIED.**

It is further **ORDERED** that the motion for release from arrest [dkt. # 689] is **DENIED.**

It is further **ORDERED** that the motion for summary judgment on suppression of evidence [dkt. # 697] is **DENIED.**

It is further **ORDERED** that the motion by claimant Daniel Gahagan for summary judgment pursuant to the excessive fines clause of the Eighth Amendment [dkt. # 698] is **DENIED.**

It is further **ORDERED** that the government's motion to strike [dkt. # 718] is **DENIED** as moot.