UNITED STATES of America,
Plaintiff–Appellee,

v.

$5,000 IN U.S. CURRENCY and $9,750 in U.S. Currency, Defendants,

Robert Walker and Thomas Harris,
Parties in Interest–Appellants.

No. 93–3851.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 1, 1994.

Decided Nov. 23, 1994.

**847**

MARTIN, J., delivered the opinion of the court, in which JORDAN, District Judge, joined. SUHRHEINRICH, J., concurred in the result only.

BOYCE F. MARTIN, Jr., Circuit Judge.

In this civil forfeiture action brought under 21 U.S.C. § 881(a)(6), claimants Robert Walker and Thomas Harris appeal the district court's grant of summary judgment in favor of the United States. For the following reasons, we reverse.

## I

On May 8, 1992, a Continental Airlines operator in Tampa, Florida received a telephone call from an anonymous man who wished to provide information regarding a drug courier traveling on Continental Airlines flight number 1451 from New York City to Cleveland, Ohio. The caller described the courier as a black male, five feet, ten inches tall, wearing glasses and a suit, and carrying both an attaché case and illegal drugs. Continental Airlines Security in Newark, New Jersey, subsequently relayed the anonymous tip to the New York Port Authority, which, in turn, passed the information on to the DEA Interdiction Unit at Cleveland Hopkins International Airport.

DEA task force agents were waiting outside the gate when flight 1451 landed in Cleveland. After watching the passengers deplane, the agents concluded that a six-foot-four-inch-tall black man, later identified as Robert Walker, most closely met the description provided by the anonymous caller. The agents then followed Walker and his traveling companion, later identified as Thomas Harris, toward the baggage claim area.

Walker walked to the baggage claim carousel, while Harris strolled outside the terminal. As Walker retrieved two garment bags from the carousel, a pair of DEA task force agents approached him and introduced themselves. After identifying himself, Walker told the agents that he and a companion were returning from New York where they had a meeting with Harry Caldwald at Epic Rec-

Kathleen L. Midian, Asst. U.S. Atty. (argued and briefed), Cleveland, OH, for plaintiff-appellee.

Sanford I. Atkin (argued and briefed), Yelsky & Lonardo, Cleveland, OH, for appellants.

Before: MARTIN and SUHRHEINRICH, Circuit Judges; and JORDAN, District Judge.*

* The Honorable Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

ords. Walker also told the officers that he and Harris had taken a flight from Cleveland to New York the previous afternoon, and identified himself as the owner of, and Harris as an employee of, Classic Realtors.

Upon request, Walker agreed to allow the two agents to search the garment bags. While the agents were looking through the luggage, Harris rejoined Walker in the terminal. In the first bag, the agents discovered a bundle of $50 bills. While the other bag contained no money, Walker voluntarily produced a small amount of money from his pants pocket and a larger bundle of currency from his jacket pocket.

Walker and Harris then agreed to accompany the agents to a security office within the airport terminal. Once in the office, the agents counted the money found in Harris' bag, which totaled $9,750, and the money from Walker's person, which totaled $5,000. After telling Walker and Harris that the government would institute forfeiture proceedings, the agents handed the two men a receipt for the currency and told them their presence was no longer required. Walker and Harris then left the airport.

Some time later, Maggie, a narcotics detection dog, arrived at the security office. Maggie discovered the money, which had been secreted in evidence envelopes stashed inside the office, and reacted positively for narcotics.

## II

On September 15, 1992, the United States filed a complaint seeking forfeiture of the money seized from Walker and Harris. Shortly thereafter, Walker filed a claim for the $5,000, and Harris filed a claim for the $9,750. The government moved for summary judgment two months later, claiming that it had established probable cause of a substantial connection between the currency and illegal drug activity. The district court ultimately agreed. On June 24, 1993, the court granted the government's motion, ordered the $14,750 forfeited to the United States, and dismissed the case. This timely appeal followed.

## III

This Court reviews a grant of summary judgment in a forfeiture action *de novo*, viewing the facts in the light most favorable to the non-moving party. *United States v. $53,082.00 in United States Currency*, 985 F.2d 245, 248 (6th Cir.1993). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

Money furnished "in exchange for a controlled substance" or "traceable to such an exchange" is subject to forfeiture. Specifically, the civil forfeiture provision of the Controlled Substances Act provides, in pertinent part:

> the following shall be subject to forfeiture to the United States and no property right shall exist in them:
>
> . . . .
>
> 6) All moneys ... furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys ... used or intended to be used to facilitate any violation of this subchapter....

21 U.S.C. § 881(a)(6). Under Section 881, the government bears the initial burden of demonstrating probable cause of "a substantial connection between the property and the underlying criminal activity." *$53,082.00*, 985 F.2d at 250 (quoting *United States v. $22,287.00 in United States Currency*, 709 F.2d 442, 446 (6th Cir.1983)). Thus, the government here was required to establish "a reasonable ground for belief, supported by more than mere suspicion, that there is a substantial connection between the seized money and an illegal drug transaction." *United States v. $67,220.00 in United States Currency*, 957 F.2d 280, 284 (6th Cir.1992).

On the facts of this case, the government has failed to carry its burden. The government relies on the following pieces of evidence to demonstrate the requisite connection between the currency seized from Walker and Harris and narcotics activity: Walker matched, to some degree, the drug

courier description provided by the anonymous caller; Walker carried $5,000 on his person; Harris transported $9,750 in his luggage; Walker and Harris traveled to New York for a single day; the currency was found in bundles, wrapped with rubber bands; Maggie, the narcotics detection dog, alerted to the money; Walker lied about the purpose of his trip (when contacted by officers in October 1992, Harry Caldwald at Epic Records confirmed that he knew Walker, but stated that he had not seen Walker on May 7, 1992); and Harris pleaded guilty in an Ohio court on March 13, 1986 to one count of trafficking in drugs and one count of permitting drug abuse. We review each of these facts in turn to determine whether, in the aggregate, the evidence establishes probable cause. *$67,220.00*, 957 F.2d at 284.

As even the most cursory review of the record reveals, the anonymous tip upon which the government relies is utterly devoid of probative weight. The anonymous informant described the unnamed drug courier as a sole black man, five feet, ten inches tall, wearing glasses and a suit, and carrying both an attaché case and illegal drugs. Walker, by contrast, stands six feet, four inches tall, carried no luggage or drugs, and visibly traveled with a companion. The government's "verified" informant's tip is thus reduced to this: Walker was one of several well-dressed black men wearing glasses on flight 1451. We find the government's suggestion that this fact has any import dubious at best.

■ We likewise find the evidentiary value of the narcotics dog's alert to be minimal.[1] As this Court recently observed:

> [T]here is some indication that residue from narcotics contaminates as much as 96% of the currency currently in circulation." *United States v. $80,760.00 in United States Currency*, 781 F.Supp. 462, 475 & n. 32 (N.D.Tex.1991). *See also Use of Drug–Sniffing Dogs Challenged: ACLU Back Complaint by Men Whose Pocket Cash Was Seized*, Wash. Post, May 6, 1990, at D1 ("I would not want to walk into court and rely exclusively on a dog sniff for

a forfeiture of money," said Charles S. Saphos, Chief of the U.S. Justice Department's Narcotic and Dangerous Drugs Section. "There are a lot of guys out there that have been shown that there is a trace [of] dope on a lot of money out there. And for that reason alone, I'd want more than just the dog."); *Dirty Money*, United States Banker, October 1989, at 10 (discussing study by Lee Hearn, Chief Toxicologist for Florida's Dade County Medical Examiner's Office, that 97% of bills from around the country tested positive for cocaine; noting also that banks play a role in spreading the cocaine traces when tellers count and recount money, rubbing one bill against another). Thus, a court should "seriously question the value of a dog's alert without other persuasive evidence...." *$80,760.00*, 781 F.Supp. at 476 (and cases cited therein).

*$53,082.00*, 985 F.2d at 250 n. 5. The District of Columbia Circuit voiced similar concerns in a recent forfeiture case:

> In order to blunt the implications of [cocaine being found on his currency, the defendant] called an expert, Dr. James Woodford, who testified that 90 percent of all cash in the United States contains sufficient quantities of cocaine to alert a trained dog, [citation omitted]. Officer Beard, the dog handler, suggested on the basis of hearsay that the number was lower, near 70 percent. (There is at least one study indicating that up to 97 percent of all bills in circulation in the country are contaminated by cocaine, with an average of 7.3 micrograms of cocaine per bill. *Crime and Chemical Analysis*, 243 Science 1554, 1555 (1989).)

> Why the nation's currency is so thoroughly corrupted has been a topic of inquiry. It has been estimated that one out of every three circulating bills has been involved in a cocaine transaction. R. Siegel, Intoxication 293 (1989). Cocaine attaches—in a variety of ways—to the bills, which in turn contaminate others as they pass through cash registers, cash drawers, and counting

---

1. As it is unclear on the record before this Court whether Walker and Harris have properly raised a Fourth Amendment challenge to the dog sniff, we leave this issue to the district court for resolution.

machines at banks and commercial establishments, *id.; Crime and Chemical Analysis, supra* note 2, at 1555 [citation omitted]. Dr. Woodford testified that, as a result, bills may contain as little as a millionth of a gram of cocaine, but that is many times more cocaine than is needed for a dog to alert.... *See generally* Taslitz, *Does the Cold Nose Know? The Unscientific Myth of the Dog Scent Lineup,* 42 HASTINGS L.J. 15, 29 & n. 71 (1990). *United States v. $639,558.00 in United States Currency,* 955 F.2d 712, 714 n. 2 (D.C.Cir. 1992); *see also United States v. Carr,* 25 F.3d 1194, 1214–17 (3d Cir.1994) (Becker, J., concurring in part and dissenting in part) ("a substantial portion of United States currency now in circulation is tainted with sufficient traces of controlled substances to cause a trained canine to alert to their presence"); *Jones v. United States Drug Enforcement Admin.,* 819 F.Supp. 698, 719–21 (M.D.Tenn. 1993) (concluding, given growing evidence of widespread currency contamination, that "the continued reliance of courts and law enforcement officers on dog sniffs to separate 'legitimate' currency from 'drug-connected' currency is logically indefensible"). Particularly in light of the fact that the agents precluded Walker and Harris from observing the dog's actions and thereby foreclosed effective inquiry on this point, we conclude that Maggie's reaction is insufficiently indicative of probable cause.

██ The remaining facts do not establish probable cause. While this Court has recognized that "carrying a large sum of cash is strong evidence of some relationship with illegal drugs," *$67,220.00,* 957 F.2d at 285, we agree with the Ninth Circuit that "[f]ifteen to twenty thousand dollars is hardly enough cash, standing alone, to justify more than a suspicion of illegal activity." *United States v. $191,910.00 in United States Currency,* 16 F.3d 1051, 1072 (9th Cir.1994); *see also United States v. Baro,* 15 F.3d 563, 568 (6th Cir.1994) ("To date, this Court has not held that currency is contraband."), *cert. denied,* — U.S. —, 115 S.Ct. 285, 130 L.Ed. 2d 201 (1994). Moreover, although we recognize that "evasive statements to police officers indicate possible criminal activity," Walker's explanation of the purpose of his trip provides, at best, "inchoate and unparticularized suspicion." *$53,082.00,* 985 F.2d at 250 (citing *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)); *see also $191,910.00,* 16 F.3d at 1072 ("These kind of inconsistencies may raise a suspicion that Morgan was involved in illegal activities, but not probable cause."). Finally, the fact that Harris pleaded guilty to state drug charges more than six years earlier is of little import here: a man's debt to society cannot be of infinite duration.

In sum, we find this case virtually indistinguishable from *$53,082.00,* where this Court found that the government failed to establish probable cause to support a forfeiture. As the *$53,082* court emphasized, the facts upon which the government relied "present only some suspicion that claimants were involved in some drug transaction." *$53,082.00,* 985 F.2d at 251. Because a more substantial showing of a connection between the money and drug activity is required, we must reverse.

**IV**

For the foregoing reasons, the judgment of the district court is reversed.