**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**$99,990.00 IN UNITED STATES CUR-
RENCY; $4,000.00 in United States
Currency, Defendants,**

**Gerald Victor Boucher, Claimant–
Appellant.**

No. 01–5685.

United States Court of Appeals,
Sixth Circuit.

July 17, 2003.

BEFORE: MARTIN, Chief Judge, KRUPANSKY and COLE, Circuit Judges.

## OPINION

PER CURIAM.

Claimant–Appellant Gerald V. Boucher appeals: (1) the district court's denial of his motion to suppress the fruits of a search of his motel room and automobile; and (2) the district court's grant of summary judgment in favor of the United States, and denial of his motion for summary judgment, on the issue of whether there was probable cause to support the forfeiture of currency pursuant to 21 U.S.C. § 881(a)(6). For the reasons discussed herein, we **AFFIRM** the district court's denial of Boucher's motion to suppress and grant of summary judgment in favor of the Government as to the $99,990 in United States currency. We **REVERSE** the grant of summary judgment as to the $4,000 in United States currency.

## I. BACKGROUND

### A. Factual Background

On July 21, 1999, an informant told agents at the Drug Enforcement Administration Task Force office in Lexington, Kentucky that young, black, male "gang-bangers" were trafficking in controlled substances at the Econo Lodge motel in Lexington and that they were using a silver car with Michigan license plates that had been rented in Detroit. That day, agents from the DEA Task Force went to the Econo Lodge, where they observed a vehicle matching the description of the suspect vehicle—a silver Dodge Intrepid with Michigan license plates—in the parking lot. An hour and a half later, the agents saw the car pull out of the parking lot and decided to follow it. They soon observed that an older, white, male—Boucher—was driving the car.

The agents followed Boucher for approximately fifteen minutes. Boucher drove onto Newtown Pike from the motel parking lot and made a left onto New Circle Road. He then made a left across two lanes of traffic, entered a parking lot, made a U-turn, and pulled out of the parking lot. He returned to New Circle Road, turned right onto Russell Cave Road, and then made an immediate left turn into another parking lot, where he made another U-turn. According to Agent Jeff Meade, Boucher was "kind of looking around" to see if anyone was following him. Boucher then turned right onto New Circle Road again. He drove west on New Circle Road for approximately two miles. He then took the Georgetown Road exit, drove up the ramp, made a left turn, and drove back inbound onto Georgetown Road. He made two left turns and returned to New Circle Road and traveled northeast.

At this point, the agents were stopped at a traffic light and unable to follow Boucher. They radioed for assistance in monitoring Boucher, "because they knew [Boucher] was operating in kind of a fashion that it was appearing that he was—as we call dragging for heat, to see if anyone is following him." According to the agents, Boucher engaged in a series of driving maneuvers characteristic of someone who was trying to see if anyone was following him. Boucher later claimed that he was a visitor in a strange city, looking for a place to eat and shop during heavy lunchtime traffic.

The agents ran a check of the license plate of the Dodge Intrepid and learned it was a rental car. National Car Rental at Detroit Metropolitan Airport informed the agents that Boucher had rented the vehicle at the airport on July 16, 1999, using an Arizona driver's license. In addition, the agents checked National Crime Informa-

tion Center records and discovered that Boucher had a 1989 felony conviction for possession with intent to distribute marijuana and possession of a firearm. A check of the motel's records revealed that Boucher had registered on July 19, 1999. On July 21, he asked to be moved to a room located at the back of the building. He was moved to room 415.

The agents returned to the Econo Lodge later that day. They planned to attempt to "knock and talk" to the occupants of room 415. The Dodge Intrepid was not present when the agents arrived, but, while they were investigating an unrelated matter, Boucher, driving the vehicle, returned to the rear motel parking lot. At the time, approximately eight hours had passed since Boucher left the parking lot that morning. Boucher was hesitant to park the vehicle with agents and officers present. An officer blocked in the car, approached Boucher, and asked him for identification. Boucher identified himself and presented a Nevada driver's license. Asked why he was in Lexington, Boucher stated that he was there to buy antiques. The agents told Boucher that they were investigating drug activity and asked to search his motel room. Boucher consented to a search of his room. Inside, the agents discovered $4,000 in United States currency, which was bound by rubber bands, in a shaving kit. Boucher then asked the agents to leave.

While the agents were searching Boucher's room, a drug-detecting canine performed an exterior search of the Dodge Intrepid in the parking lot. The dog made a positive alert on the driver-side door handle and trunk. When this was brought to Boucher's attention, he refused to consent to an automobile search and asked if he was free to leave. The agents replied that he was free to leave but that he could not take the car. The agents did not obtain a search warrant but decided that there was probable cause to search the trunk of the car. Boucher continued to refuse to consent to a search, but he handed over his keys in order to avoid damage to the rental car.

When the trunk was opened, the dog jumped inside and made a positive alert to a package inside the trunk. The package was wrapped in duct tape and appeared to the agents to contain a kilogram of contraband. Boucher stated that the package contained $100,000, and not drugs. The package consisted of three layers of duct tape with a layer of plastic between each layer of tape. Inside the large package were two smaller packages layered in duct tape and plastic. The agents opened the packages to discover a total of $99,990 in United States currency. Asked about the origin of the money, Boucher told the agents that it represented his life savings and explained that he was carrying the money because he was concerned about Y2K problems and did not trust banks to keep his money safe.

The Government seized the $99,990 and the $4,000 on the grounds that it allegedly was used or intended to be used in the purchase of an illegal controlled substance or was the proceeds of a sale of a controlled substance. Boucher was allowed to leave, with the car, and has never been charged with any offense in connection with the seized currency. The Government did not perform a lab test on the money to determine whether, or what type or amount of, a controlled substance was present.

### B. Procedural Background

On January 27, 2000, the Government initiated a civil action *in rem* under 21 U.S.C. § 881(a)(6) by filing a Verified Complaint of Forfeiture in the Eastern District of Kentucky for the forfeiture of

$99,990 and $4,000 in United States currency that allegedly was used or intended to be used in exchange for controlled substances, constituted proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* On February 7, 2000, the district court determined that there was probable cause to support the forfeiture of the currency and reasonable suspicion to support its seizure. On February 7, 2000, Boucher filed a Notice of Claim of Ownership and, on February 23, 2000, he filed an Answer to the Government's Complaint of Forfeiture.

On January 18, 2001, Boucher filed a Motion for Summary Judgment based on a lack of probable cause for the forfeiture and, on January 31, 2001, he filed a Motion to Suppress the fruits of the Government's searches. On January 19, 2001, the Government filed a Motion for Summary Judgment. On April 2, 2001, the district court held a hearing on Boucher's Motion to Suppress and on the cross-motions for summary judgment. On May 1, 2001, the district court denied Boucher's Motion to Suppress and Motion for Summary Judgment, granted the Government's Motion for Summary Judgment, and ordered forfeiture of the currency in accordance with § 881. Boucher filed a timely appeal to this Court.

## II. DISCUSSION

### A. Motion to Suppress

First, Boucher appeals the denial of his motion to suppress the fruits of the search of his motel room and automobile, arguing that the Government did not have reasonable suspicion to support a *Terry* stop. The Government admits that it initiated a *Terry* stop when Boucher returned to the motel and an officer blocked Boucher's car in the parking lot.

An investigative detention is a seizure that is subject to Fourth Amendment scrutiny. *United States v. Saari,* 272 F.3d 804, 808 (6th Cir.2001) (citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Officers may not initiate an investigatory detention of an individual unless they have reasonable suspicion to believe that the individual has been involved in criminal activity. *Terry,* 392 U.S. at 21–22; *Northrop v. Trippett,* 265 F.3d 372, 381 (6th Cir.2001). Officers must point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" intrusion upon the constitutionally protected interests of a private citizen. *Terry,* 392 U.S. at 21; *see United States v. Harris,* 192 F.3d 580, 584 (6th Cir.1999). Furthermore, officers "must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch'" that criminal activity may be afoot. *Harris,* 192 F.3d at 584 (quoting *Terry,* 392 U.S. at 27). However, "a series of acts, each of which is consistent with innocent behavior, may when taken together, amount to reasonable suspicion." *Id.*

"In reviewing a motion to suppress, we must review factual findings for clear error and review legal determinations *de novo.* The district court's factual findings will be overturned only if the reviewing court has the 'definite and firm conviction that a mistake has been committed.'" *United States v. Pinson,* 321 F.3d 558, 562 (6th Cir.2003) (citations omitted). "[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *see also United States v. Waldon,* 206 F.3d 597, 602 (6th Cir.2000).

The district court found that the following facts were available to the agents at

the time of the stop: (1) the informant's tip that young, black, male gang-bangers were using a silver car with Michigan license plates to facilitate the drug trade out of the Econo Lodge; (2) the agents' observations of Boucher's erratic and evasive driving; (3) the fact that Boucher rented the car in Detroit, a DEA "source-city;" and (4) Boucher's prior conviction for marijuana possession.

■ According to the district court, the third factor was not probative of criminal activity. With respect to the first factor, the district court determined that the informant's description of the vehicle had "some probative value under the totality of the circumstances," but the Government's failure to provide evidence of the informant's record for veracity undercut the value of the tip. The district court determined that the second and fourth factors provided stronger support for a finding of reasonable suspicion. The officers' observations of Boucher's evasive driving gave rise to reasonable suspicion for a *Terry* stop. Although Boucher explained that his driving behavior was the result of his being lost during lunch hour in an unfamiliar city, according to the district court, even if such claims were sincere, they were irrelevant. The reason for his erratic driving did not matter, as the focus of the inquiry was whether the officers' suspicions were reasonable under the circumstances. In this case, the district court found that the suspicions were reasonable: "The facts of this case lead to the inescapable conclusion that the officer's [sic] observed conduct which could reasonable be described as evasive. Charting a path through heavy traffic which incorporates as many as four sudden changes in direction is conduct consistent with attempting to evade a pursuer." In addition, the district court found that Boucher's ten-year-old conviction for possession of marijuana contributed to a

finding of reasonable suspicion. The district court concluded, based on a review of all of the evidence before it, that the police acted with reasonable suspicion in initiating the *Terry* stop. As a result of the stop, according to the district court, Boucher gave valid consent to the search of his motel room. The district court therefore denied the motion to suppress.

Boucher now argues that the district court erred in denying the motion to suppress, claiming that reasonable suspicion for an investigatory detention did not exist. First, Boucher argues that the informant's tip does not create reasonable suspicion for the stop because the description of the suspect did not match Boucher's description. Second, Boucher contends that the fact that he traveled from Detroit, an alleged "source city," carries no evidentiary value. Third, Boucher concedes that his prior conviction is a factor that can be considered by law enforcement in making a stop but contends that it does not alone create reasonable suspicion. Finally, Boucher argues that the officers' inferences based on observing his driving eight hours earlier do not provide reasonable suspicion to stop him.

We disagree with Boucher's contention that the district court erred in denying the motion to suppress. Based upon the totality of the circumstances, reasonable suspicion existed to support the *Terry* stop in this case. The agents used the informant's partially-accurate tip to follow Boucher, not to stop him. They then observed Boucher driving in a manner consistent with counter-surveillance techniques used by one involved in criminal activity. Courts have recognized such counter-surveillance techniques as incriminating. *See United States v. Martinez–Molina*, 64 F.3d 719, 729 (1st Cir.1995) ("It is well settled that countersurveillance efforts are indicative of knowing participation in crim-

inal activity."); *United States v. Hoyos*, 892 F.2d 1387, 1393 (9th Cir.1989) (acknowledging as incriminating the fact that the defendant was observed "driving in a manner that is typical of counter-surveillance techniques used by persons involved in large scale narcotics transactions"), *overruled on other grounds by United States v. Ruiz*, 257 F.3d 1030 (9th Cir. 2001); *see also United States v. Health*, 259 F.3d 522, 529 (6th Cir.2001) (use of counter-surveillance techniques contributed to finding of reasonable suspicion); *United States v. Taylor*, 956 F.2d 572, 578 (6th Cir.1992) (same). We have also recognized suspicious driving to be a factor contributing to reasonable suspicion. *See Watkins v. City of Southfield*, 221 F.3d 883, 889 (6th Cir.2001). After observing Boucher's suspicious driving and learning of his prior conviction, there was a reasonable and objective basis for an investigative stop in the motel parking lot later in the day.

## B. Summary Judgment

Boucher appeals the grant of summary judgment in favor of the Government, arguing that the Government failed to satisfy its burden of demonstrating that the $99,990 and the $4,000 in United States currency were subject to forfeiture. "This Court reviews a grant of summary judgment in a forfeiture action *de novo*, viewing the facts in the light most favorable to the non-moving party." *United States v. $5,000 in U.S. Currency*, 40 F.3d 846, 848 (6th Cir.1994).

The civil forfeiture provision of the Controlled Substances Act provides, in pertinent part:

The following shall be subject to forfeiture to the United States and no property right shall exist in them:

. . .

(6) All moneys ... furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys ... used or intended to be used to facilitate any violation of this subchapter. . . .

21 U.S.C. § 881(a)(6).

The district court applied the burden of proof that was in place prior to the enactment of the Civil Asset Forfeiture Reform Act of 2000, Pub.L. No. 106–185, 114 Stat. 202 (codified at 18 U.S.C. § 983) ("CAFRA"). Under the earlier framework, the government has the initial burden of demonstrating probable cause to believe that the property is subject to forfeiture. To meet this burden, the government " 'must establish probable cause to believe that a substantial connection exists between the property to be forfeited and the illegal exchange of a controlled substance.' " *United States v. $67,220.00 in United States Currency*, 957 F.2d 280, 283 (6th Cir.1992) (quoting *United States v. 526 Liscum Drive*, 866 F.2d 213, 216 (6th Cir. 1989)). Upon such a showing, the burden then shifts to the claimant to demonstrate by a preponderance of the evidence that the property is not subject to forfeiture. *See* 21 U.S.C. § 881(d); 19 U.S.C. § 1615; *United States v. $174,206.00 in United States Currency*, 320 F.3d 658, 661–62 (6th Cir.2003). CAFRA heightens the Government's burden: "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1).

By its terms, CAFRA applies to forfeiture proceedings commenced on or after the date that is 120 days after its enactment. 114 Stat. at 225. CAFRA was enacted on April 25, 2000, and 120 days after that date was August 23, 2000. *See*

*United States v. Real Property in Otsego County,* 241 F.3d 796, 798 (6th Cir.2001). In this case, the civil forfeiture complaint was filed on January 27, 2000–before August 23, 2000. However, in *Otsego County,* we applied CAFRA's burden of proof provision retroactively to a case pending on appeal on the date of the statutory enactment. *Id.* at 800.

Although the district court applied the pre-CAFRA burden-shifting framework, we affirm the grant of summary judgment as to the $99,990 in United States currency because we find that the Government has met its burden under either standard --- there is probable cause to believe that the currency is subject to forfeiture, which has not been rebutted by evidence of legitimate income, and the Government has shown by the preponderance of the evidence that the property is subject to forfeiture. *See $174,206.00 in United States Currency,* 320 F.3d at 662 (finding the United States had met its burden under either standard).

█ First, the fact that Boucher had close to $100,000 --- an unusually large amount of currency to carry --- supports forfeiture. While the presence of a large amount of cash is insufficient, standing alone, to support forfeiture, "carrying a large sum of cash is strong evidence of some relationship with illegal drugs." *$67,220.00 in United States Currency,* 957 F.2d at 285; *see also United States v. $215,300,* 882 F.2d 417, 419 (9th Cir.1989), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990). This Court has adopted the position of the Ninth Circuit that "[f]ifteen to twenty thousand dollars is hardly enough cash, standing alone, to justify more than a suspicion of illegal activity." *$5,000 in United States Currency,* 40 F.3d at 850 (quoting *United States v. $191,910.00 in United States Currency,* 16 F.3d 1051, 1072 (9th Cir.1994)). In this

case, the substantially larger amount of currency that Boucher was carrying is strong evidence of a connection to illegal drugs. Moreover, the packaging of the $99,990 is evidence of drug-related activity. *See United States v. $129,727.00 in United States Currency,* 129 F.3d 486, 491 (9th Cir.1997) ("[T]he nexus to drugs was provided by the distinctive manner in which the currency was wrapped in fabric softener sheets and plastic wrap. The narcotics detail recognized this wrapping as an indication of drug-related activity."); *cf. United States v. $10,700.00 in United States Currency,* 258 F.3d 215, 232–33 (3d Cir.2001) ("As for the manner of packaging—rubber-banded in large bundles and concealed in baggage—the government has not presented evidence that this method of storage is unique to the drug trade."). Here, the $99,990 was packaged in a manner indicative of illegal drug activity—heat-sealed and wrapped in tape, consistent with how kilograms of cocaine are packaged. Indeed, the officers initially suspected that the package contained illegal drugs.

Taking into account the totality of the circumstances, other facts also support the Government's position that the property is subject to forfeiture. Boucher made several false and misleading statements to, and withheld information from, authorities. The canine alerted to Boucher's rental vehicle and to the package containing the currency. Furthermore, the informant's description of the automobile, Boucher's suspicious driving, and Boucher's prior conviction are all probative of drug-related activity.

Finally, Boucher's evidence of legitimate income does not sufficiently explain his possession of the $99,990. Consequently, we conclude that the Government has demonstrated by a preponderance of the evidence that the $99,990 was subject to

forfeiture. We therefore affirm the grant of summary judgment as to the $99,990.

■ However, we reach a different conclusion as to the $4,000 found in Boucher's motel room. The totality of the evidence surrounding the seizure of the $4,000 does not support a finding, under either the probable cause or the preponderance of the evidence standard, that this currency was connected to illegal drug activity. First, this amount is not large enough to warrant more than a suspicion of illegal activity. *See $5,000 in United States Currency,* 40 F.3d at 850. In addition, unlike the currency found in the vehicle, the $4,000 was neither packaged suspiciously nor discovered in a package to which the canine alerted so as to indicate that the currency was related to illegal drugs. The evidence common to both sums of currency—the misleading statements, evasive driving, and prior conviction—may be probative of criminal activity but does little to connect the $4,000 to illegal drug transactions. Accordingly, we reverse the grant of summary judgment with respect to the $4,000.

### III. CONCLUSION

For the reasons discussed herein, we **AFFIRM** the district court's denial of Boucher's motion to suppress and grant of summary judgment in favor of the Government as to the $99,990 in United States currency. We **REVERSE** the grant of summary judgment as to the $4,000 in United States currency.

KRUPANSKY, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority opinion's conclusion affirming the district court's denial of Boucher's motion to suppress and grant of summary judgment in favor of the Government regarding the $99,990 in U.S. currency. However, I would consider the $4,000

in U.S. currency in conjunction with the greater amount, the $99,990 in U.S. currency which was confiscated simultaneously. Consequently, I respectfully dissent from that section of the opinion reversing the district court's grant of summary judgment as to the $4,000 in U.S. currency.