RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0240p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 18-3347

REAL PROPERTY 10338 MARCY ROAD NORTHWEST, CANAL WINCHESTER, OHIO,

*Defendant*,

LEVI H. WINSTON,

*Claimant-Appellant*.

———————————

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:13-cv-01048—Elizabeth A. Preston Deavers, Magistrate Judge.

Argued:  May 7, 2019

Decided and Filed:  September 12, 2019

Before:  COLE, Chief Judge; STRANCH and READLER, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  Dennis C. Belli, BELLI LAW OFFICE, Columbus, Ohio, for Appellant.  Leah M. Wolfe, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellee. **ON BRIEF:**  Dennis C. Belli, BELLI LAW OFFICE, Columbus, Ohio, for Appellant.  Leah M. Wolfe, William B. King II, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellee.

———————————

**OPINION**

———————————

JANE B. STRANCH, Circuit Judge.   This is an appeal from the trial court's determination that a vacant lot on Marcy Road in Ohio (the Property), purchased by Appellant Levi Winston in 2012, is subject to civil forfeiture under 21 U.S.C. § 881(a)(6).  After a bench trial, the court concluded that the Government met its burden to demonstrate, by a preponderance of the evidence, a substantial connection between the money used to purchase the Property and proceeds from Winston's illegal drug sales.  On appeal, Winston argues that the Government did not meet its burden and disputes several of the lower court's factual findings.  For the reasons stated below, we **AFFIRM**.

**I.  BACKGROUND**

**A.  Factual Background**

This case revolves around Winston's activities from April 2009 to March 2013.  In the month after Winston completed a prison sentence in April 2009, he first stayed in a halfway house then moved in with his sister, Valerie Banks, with whom he lived for 29 months.  He worked at a call center and opened a business, Winston Hauling, earning income totaling $169,132 between 2009 and 2012.  In lieu of rent, he gave Banks a couple hundred dollars to defray his costs.  After initially taking the bus to work, he purchased a car in May 2010.  With the help of a Veterans Administration loan, he purchased and moved into a home at 999 Cummington Road in September 2011.   He paid taxes each year, remodeled the 999 Cummington residence (where he lived with his then-fiancée, now-wife), and spent money on everyday living expenses.  In November 2012, he signed a contract with Robin Adams to purchase the Marcy Road Property for $36,500 and gave Adams four cash payments totaling $26,500 between November 2012 and January 2013.  Though it does not appear that Winston paid the full $36,500, Adams considered the Property paid for and owned by Winston, and he was willing to provide Winston with a quitclaim deed to the Property.  The Property was never deeded to Winston.

In 2010, while operating his legitimate business, Winston also became involved in a large-scale marijuana trafficking conspiracy.  He rented several warehouses for offloading marijuana shipments, spending at least $62,091 on rent and equipment, and he paid $25,000 to an associate, Steven Johnson, for his help with renting the warehouses.  In September 2012, he purchased a van with $6,875 of drug trafficking proceeds, titling and registering the van with the names of other individuals.

In March 2013, after law enforcement surveillance of his warehouses and a search of 999 Cummington, Winston was arrested and charged on two counts:  conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. § 846, and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), for purchasing the van with drug trafficking proceeds and attempting to conceal his role in the purchase.  He pleaded guilty and was sentenced to 135 months' imprisonment.  He did not disclose his interest in the Marcy Road Property to the district court's pretrial services or probation offices.  The Government became aware of Winston's interest in the Property only after interviewing Adams following Winston's guilty plea.

**B.  Civil Forfeiture Action**

The Government then filed this civil forfeiture action under 21 U.S.C. § 881(a)(6), alleging that Winston had purchased the Property with proceeds traceable to drug sales.  The district court granted the Government's motion for summary judgment, finding that the illegal drug trafficking was the "only plausible source of income, supported by evidence in the record, from which Winston could have purchased the Marcy Road property."  According to the court, Winston had not provided evidence of any legitimate earnings in 2012, the year he purchased the Property, or evidence that he had saved enough of the previous years' legitimate income to purchase the Property in cash.

This court reversed the grant of summary judgment. *United States v. Real Prop. 10338 Marcy Rd. Nw. (Marcy I)*, 659 F. App'x 212 (6th Cir. 2016). We found that Winston's statement that he earned $150,000 in legitimate income in 2012 created a dispute of material fact over whether the Property was purchased with legitimate income or drug sale proceeds. *Id.* at 218–19. We determined that there existed a genuine dispute of material fact over whether the Government had established a substantial connection between the Property and drug proceeds and remanded the case to the district court for further proceedings. *Id.* at 220.

At the resulting bench trial, the Government presented seven witnesses testifying to Winston's everyday expenses and his drug trafficking activities, including renting warehouses for the purpose of unloading marijuana, paying $25,000 cash to Johnson for his help with the warehouses, and purchasing a van with drug proceeds. The Government presented Winston's legitimate income from 2009–2012 as $169,132. According to his 2012 tax return, Winston's legitimate income in 2012 was only $16,243, not the $150,000 he claimed in *Marcy I*. *See* 659 F. App'x at 218. Based on the figure Winston provided for his living expenses in the Presentence Investigation Report (PSI) in his criminal case (which contained a mathematical error), the Government estimated his living expenses as $148,272 for the four-year period. For Winston's case-in-chief, his sister Banks testified that he spent little money when he lived with her after leaving prison. Winston also recalled to the stand Internal Revenue Service agent Bernard Clark, who had worked on Winston's case and testified that based on his 30 years of experience, it was "common for drug dealers to use their drug profits to pay for the expenses of their business," as well as to "sometimes devote their profits to expanding their business." Clark testified that in Winston's case, it was a "fair assessment" that it was "more probable than not that the cost of the warehouse and that equipment [e.g. forklifts] was paid for with drug money." Documentary evidence submitted included the Government's summary of Winston's calculated expenses and income, Winston's personal and business tax documents, copies of cashier's checks given to Johnson for warehouse rentals, an accountant's summary of Winston's business accounts, receipts from the remodel of 999 Cummington, and receipts for jewelry purchased from Jared the Galleria of Jewelry.

Based on this evidence, the trial court made the following accounting of Winston's unrebutted expenses from 2009–2012:

| | |
|---|---|
| Payments to Jared the Galleria of Jewelry | $8,828 |
| Tax Payments | $4,756 |
| Car Payments | $5,856 |
| Warehouse Rentals | $62,091 |
| Payments to Johnson | $25,000 |
| Sept. 2012 Van Purchase | $6,875 |
| Cash Payments to Banks | $400 |
| Ford Taurus | $3,000 |
| **Total unrebutted expenditures 2009–2012** | **$116,806** |

To the $116,806, the court added several additional expenses. First, Winston had obtained a building permit authorizing $60,000 in building costs to remodel 999 Cummington but argued that he did some of the work himself and that his wife paid for some of the costs. The court chose to attribute $30,000 in home remodeling costs to Winston. The court also added living expenses for the four-year period between Winston's prior release from prison and his arrest in 2013, after which he remained in custody. The court agreed with Winston's contention that the Government's initial estimate of $147,272 of living expenses was $57,832 too high because it did not account for his living rent-free with his sister for 29 months and was based on a mathematical error in the PSI. The court thus found that the living expenses during the four-year period were $90,440: the Government's estimate of $147,272 minus $57,398. Excluding the purchase of the Property, the court calculated Winston's total known expenditures as $237,246 and subtracted that figure from his legitimate income:

| | | |
|---|---|---|
| Winston's Legitimate Income | | $169,132 |
| Unrebutted Expenses | $116,806 | |
| Remodeling costs | $30,000 | |
| Living Expenses | $90,440 | |
| Total Expenditures | $237,246 | |
| **Total Legitimate Income Available After Expenditures** | | **($68,114)** |

Based on the court's calculations, Winston spent $68,114 more than he earned in legitimate income between 2009 and 2012.  The court concluded that it was "mathematically impossible" for Winston to have purchased the Property with legitimate funds and found that the Government met its burden to show that Winston "purchased the Property with proceeds from his illegal activities."  Thus, the court found the Property forfeitable under 21 U.S.C. § 881(a)(6) based on the Government's circumstantial evidence of the substantial connection.  Winston timely appealed.

## II.  ANALYSIS

"In an appeal from a judgment entered after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo."  *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629, 633 (6th Cir. 2012) (emphasis omitted).  We "must give due regard to the trial court's opportunity to judge the witnesses' credibility."  Fed. R. Civ. P. 52(a)(6). "A district court has committed clear error only when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  *King v. Zamiara*, 680 F.3d 686, 694 (6th Cir. 2012) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

We address first Winston's factual arguments regarding the trial court's expense calculation before turning to the applicable standard under 21 U.S.C. § 881(a)(6) and assessing the evidence under that standard.

### A.  Expense Calculation

Winston contests several of the trial court's factual findings regarding his expenses.

He argues that the court clearly erred in finding his remodeling costs to be $30,000 and living expenses from 2009–2012 to be $90,440.  The remodel's building permit stated that construction costs would be $60,000, and at trial, there was evidence that Winston may have performed some work himself and that his wife paid for some of the materials.  The court properly found that Winston spent at least some money on remodeling; thus, the court did not clearly err in selecting $30,000 based on the evidence before it.  Regarding living expenses, the

court adopted the calculation Winston presented in his post-trial brief, thereby taking into account his savings from living rent-free with his sister and taking the bus to work. The court did not err in using this calculation.

Winston also argues that the trial court improperly calculated his "unrebutted expenses" by double-counting his automobile-related expenses and including $93,966 of drug trafficking expenses—the September 2012 van purchase ($6,875), warehouse rentals ($62,091), and payments to Johnson ($25,000).

First, the trial court listed as unrebutted expenses a total auto loan payment of $5,856, reflecting a loan taken out in May 2011, as well as a Ford Taurus purchased for $3,000. Winston argues that his $5,856 of car payments should not be treated as a separate expense because his car payments were included in his monthly living expenses. This is incorrect; Winston's monthly living expenses of $2,783.60 (the figure from his PSI that he, the Government, and the trial court use) do not include a monthly car payment. The trial court did not err in counting Winston's car payment of $5,856 separately. As to the Ford Taurus, the only evidence that Winston purchased it is Winston's sister's testimony that he purchased the Taurus for about $3,000 or $4,000 while residing with her. But based on Winston's bank statements and the vehicle assets listed in his Pretrial Services Report, the Taurus is the same car for which Winston made $5,856 in car payments. The court clearly erred by including the Taurus as an unrebutted expense.

Second, the trial court specifically found that Winston purchased the $6,875 van with drug proceeds because that purchase was the basis for Winston's conviction for money laundering. This finding rebutted the Government's assertion that Winston purchased the van with legitimate income. The court clearly erred by including the $6,875 van purchase as an unrebutted expense.

It is a closer call, however, whether the court erred by considering the $62,091 spent on warehouse rentals and $25,000 on Johnson's payments. That Winston spent that money is unrebutted. But Winston argues that he paid for drug trafficking expenses with drug proceeds, rather than with his legitimate income. His evidence consists of IRS agent Bernard Clark's

testimony that it is "common for drug dealers to use their drug profits to pay for the expenses of their business," and that it was a "fair assessment" that it is more probable than not that Winston himself used drug proceeds to pay for the warehouse and equipment. The court found Clark to be a credible witness. The court also made the factual finding that "[l]arge-scale trafficking of marijuana in the Columbus area, akin to Winston's during the relevant time period, is highly lucrative," but at trial, Winston submitted no specific evidence of his illegitimate earnings. Having heard the evidence and evaluated the witnesses, the court included the drug trafficking expenses in Winston's unrebutted expenses.

The importance of this factual finding is highlighted by the following table summarizing three different calculations of total expenses: (1) the trial court's calculation, (2) the calculation excluding the court's errors but including Winston's drug trafficking expenses, and (3) the calculation that excludes the court's errors and Winston's drug trafficking expenses:

Table 1.

| Income and Expenses 2009–2012 | Trial Court Calculation | Calculation without Taurus or drug van expense | Calculation without Taurus or any drug expenses |
|---|---|---|---|
| **Legitimate Income** | **$169,132** | **$169,132** | **$169,132** |
| Payments to Jared the Galleria of Jewelry | ($8,828) | ($8,828) | ($8,828) |
| Tax Payments | ($4,756) | ($4,756) | ($4,756) |
| Car Payments | ($5,856) | ($5,856) | ($5,856) |
| Warehouse Rentals | ($62,091) | ($62,091) | $0 |
| Payments to Johnson | ($25,000) | ($25,000) | $0 |
| Sept. 2012 Van Purchase | ($6,875) | $0 | $0 |
| Cash payments to Banks | ($400) | ($400) | ($400) |
| Ford Taurus | ($3,000) | $0 | $0 |
| **Total Unrebutted Expenses** | **($116,806)** | **($106,931)** | **($19,840)** |
| Remodeling costs | ($30,000) | ($30,000) | ($30,000) |
| Living Expenses | ($90,440) | ($90,440) | ($90,440) |
| **Total Expenses** | **($237,246)** | **($227,371)** | **($140,280)** |
| **Legitimate Income Available After Expenditures** | **($68,114)** | **($58,239)** | **$28,852** |

Only in the third column, which excludes the drug trafficking expenses, does Winston have enough total legitimate income available after total expenses—$28,852—to make $26,500 in cash payments for the Property.

We first explain the Government's burden to establish forfeiture in § 881(a)(6) civil forfeiture cases then examine the issues concerning Winston's income and expenses.

### B.  Civil Forfeiture under 21 U.S.C. § 881(a)(6)

The Civil Asset Forfeiture Reform Act of 2000 (CAFRA) changed the government's burden of proof in civil forfeiture actions.  Previously, the government needed to show only probable cause that the property was subject to forfeiture.  *See United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 661–62 (6th Cir. 2003).  Now, under CAFRA, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture."  18 U.S.C. § 983(c)(1).  This burden "requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence."  *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993) (citation and internal quotation marks omitted).  "If the United States meets its burden, it will prevail unless a claimant introduces evidence to support his case. . . ."  *United States v. Cunningham*, 520 F. App'x 413, 415 (6th Cir. 2013).  But if the government does not meet its initial burden, the claimant prevails.  In that situation, claimants are "under no obligation to come forward with evidence of their rightful ownership."  *United States v. $125,938.62*, 537 F.3d 1287, 1294 (11th Cir. 2008).

The Government seeks forfeiture of the Marcy Road Property under the "proceeds theory" referenced in the civil forfeiture section of the Controlled Substances Act (CSA), which provides for forfeiture of:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, *all proceeds traceable to such an exchange*, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

21 U.S.C. § 881(a)(6) (emphasis added); *see United States v. Premises Known as 8584 Old Brownsville Rd.*, 736 F.2d 1129, 1131 (6th Cir. 1984) (finding real property forfeitable under 21 U.S.C. § 881(a)(6) when purchased with illegal drug sale proceeds).

In *Marcy I*, we explained that before CAFRA was passed, the language of the CSA required "that the government show probable cause of 'a substantial connection between the property and the underlying criminal activity'" in proceeds cases. *Marcy I*, 659 F. App'x at 215 (quoting *United States v. Fifty-Three Thousand Eighty-Two Dollars in U.S. Currency, $53,082.00*, 985 F.2d 245, 250 (6th Cir. 1993)). This conclusion is supported by Congress's joint explanatory statement on the Senate bill that added subsection (a)(6) to 21 U.S.C. § 881:

> Due to the penal nature of forfeiture statutes, it is the intent of these provisions that property would be forfeited only if there is a substantial connection between the property and the underlying criminal activity which the statute seeks to prevent. . . . [The Senate amendment] provides for forfeiture of property which is the proceeds of an illegal drug transaction only if there is a traceable connection [between] such property and the illegal exchange of controlled substances. Thus if such proceeds were, for example, commingled with other assets, involved in intervening legitimate transactions, or otherwise changed in form: they would still be subject to forfeiture, but only to the extent that it could be shown that a traceable connection to an illegal transaction in controlled substances existed.

*Id.* at 216 (quoting Joint Explanatory Statement of Titles II and III, Psychotropic Substances Act of 1978, Pub. L. 95-633, *reprinted in* 1978 U.S. Code Cong. & Admin. News 9518, 9522). Noting "CAFRA's imposition of a more stringent burden of proof," we held that the Government must "establish by a preponderance of the evidence that the Marcy Road property was purchased by Winston with cash that had a 'substantial connection' to an unauthorized drug sale." *Id.*

### 1. Substantial Connection

The government may use direct tracing to establish the requisite substantial connection to illegal activity. For example, actions under the federal civil forfeiture statute at 18 U.S.C. § 981(a) authorize the forfeiture of property derived from proceeds "traceable to" a qualifying criminal violation. In *United States v. $72,050.00 in U.S. Currency*, 587 F. App'x 241 (6th Cir. 2014), the government met its burden under 18 U.S.C. § 981(a) to show a substantial connection between the money sought to be forfeited and the claimant's fraud through an "'extensive

review' of the relevant bank records [that] could trace the amount to investor funds." *Id.* at 244. Though that claimant attempted to present a different explanation for the money's origins, we found the government's tracing evidence more persuasive. *Id.* Thus, direct tracing can be a valuable tool for the government in meeting its burden of proof.

In civil forfeiture cases under 21 U.S.C. § 881(a)(6), however, the government may also meet its burden with circumstantial evidence of the substantial connection between the subject property and illegal drug sales. *See Cunningham*, 520 F. App'x at 415; *United States v. $110,873.00 in U.S. Currency*, 159 F. App'x 649, 652 (6th Cir. 2005); *see also United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1013 (9th Cir. 2013) ("The government may meet its burden with sufficiently strong circumstantial evidence linking the currency to drug trafficking in general."); *United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 501 (8th Cir. 2004) ("Circumstantial evidence can be used by the United States to establish its burden of proof.").

Circumstantial evidence of a substantial connection is evaluated under "the totality of the circumstances." *United States v. $99,990.00 in U.S. Currency*, 69 F. App'x 757, 763 (6th Cir. 2003); *accord United States v. Funds in Amount of $30,670.00*, 403 F.3d 448, 469 (7th Cir. 2005) ("[W]e consider the totality of the evidence as a whole and in the appropriate context."). In pre-CAFRA cases, where the government had a lower burden of proof, we reviewed "each of the[] facts in turn to determine whether, in the aggregate, the evidence establishes [the government's burden]." *United States v. $5,000.00 in U.S. Currency*, 40 F.3d 846, 849 (6th Cir. 1994). "While we must consider all of the government's evidence in order to determine whether [the burden was met], we must also consider the relative strengths and weaknesses of that evidence." *United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 286 (6th Cir. 1992). This totality test still applies under the government's more stringent burden of proof imposed by CAFRA. Each fact-specific case thus requires the court to assess whether the government's "cumulation of . . . evidence" is strong enough to make its explanation more probable than not. *$110,873.00 in U.S. Currency*, 159 F. App'x at 652.

We have addressed the efficacy of certain types of circumstantial evidence, such as the presence of cash, signs of drug activity, and misleading of authorities. Carrying large amounts of

cash is "insufficient, standing alone, to support forfeiture," but may be "strong evidence of some relationship with illegal drugs." *$99,990.00 in U.S. Currency*, 69 F. App'x at 763 (citation and internal quotation marks omitted); *see also $5,000 in U.S. Currency*, 40 F.3d at 850 ("[W]e agree with the Ninth Circuit that '[f]ifteen to twenty thousand dollars is hardly enough cash, standing alone, to justify more than a suspicion of illegal activity.'" (quoting *United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1072 (9th Cir. 1994))). In one case, the government carried its burden to establish forfeiture of $99,990 in cash by presenting the following cumulation of evidence: officers found the enormous sum of cash in the claimant's vehicle, the cash was packaged in a manner suggesting drug activity ("heat-sealed and wrapped in tape, consistent with how kilograms of cocaine are packaged"), a drug dog alerted to the vehicle and to the cash, the claimant made "false and misleading statements" to police, and additional evidence about the vehicle was probative of drug activity. *$99,990.00 in U.S. Currency*, 69 F. App'x at 763. The government did not, however, carry its burden as to the $4,000 in cash found in the same claimant's motel room because it was "neither packaged suspiciously nor discovered in a package to which the canine alerted." *Id.* at 764.

Additional circumstantial evidence may include "evidence of legitimate income that is insufficient to explain the large amount of property seized, unrebutted by any evidence pointing to any other source of legitimate income or any evidence indicating innocent ownership." *$174,206.00 in U.S. Currency*, 320 F.3d at 662. For example, the government met its burden where two claimants reported a total of $31,142 in legitimate income over five years and could not explain their possession of safe deposit boxes containing $174,206. *Id.* Similarly, other courts have found that the government met its burden by presenting evidence of claimants' legitimate income weighed against their everyday expenses, where expenses for homes, jewelry, or luxury cars significantly exceeded their legitimate means. *See, e.g.*, *United States v. 6 Fox St.*, 480 F.3d 38, 43–44 (1st Cir. 2007) (finding minimal legitimate income could not cover tens of thousands of dollars of expenses).

If the government initially meets its burden, the claimant prevails if he presents "any evidence pointing to any other source of legitimate income or any evidence indicating innocent ownership" that rebuts the government's evidence. *$174,206.00 in U.S. Currency*, 320 F.3d at

662. In *United States v. Veggacado*, 37 F. App'x 189 (6th Cir. 2002), an action under § 881(a)(6) seeking the forfeiture of seized cash, jewelry, and a computer, the claimant "had no apparent income other than from drug trafficking," "lived affluently and leased a Mercedes Benz for $850 per month," and owned fourteen pieces of jewelry ranging in value from $350 to $37,000 with no "bills of sale, evidence of insurance coverage, or probate documents to show any legitimate source for the property." *Id.* at 190. The jury, however, credited the claimant's testimony that one gold religious pendant was left to him by his mother and other pieces of jewelry were purchased with his wife's legitimate income. *Id.* at 191. The jury thus found that, in the face of the claimant's evidence of legitimate ownership, the government did not ultimately meet its burden to establish a substantial connection between those four pieces of jewelry and drug proceeds. *Id.*

Though Winston acknowledges that evidence of a claimant's minimal legitimate income is persuasive in some cases, he argues that in a closer case, where the claimant's legitimate income could feasibly cover the purchase of the subject property, the government must provide more *direct* evidence of the substantial connection to meet its burden. He cites Congress's policy statement on § 881(a)(6), which explained that if illegal drug sale proceeds "were, for example, commingled with other assets, involved in intervening legitimate transactions, or otherwise changed in form: they would still be subject to forfeiture, *but only to the extent that it could be shown that a traceable connection to an illegal transaction in controlled substances existed*." He urges us to read 21 U.S.C. § 881(a)(6) as requiring, in cases involving significant legitimate income commingled with illegitimate income, that the Government use direct tracing methods to establish "how much of the value of the funds [to purchase the property] came from untainted sources and how much came from tainted sources." He points to tracing methods used in other circuits in criminal forfeiture cases as examples of the rigid tracing used in such commingled-income cases. *See United States v. Ayika*, 837 F.3d 460, 472 (5th Cir. 2016); *United States v. Voigt*, 89 F.3d 1050, 1087 (3d Cir. 1996).

Though some cases of commingled income may require direct tracing evidence for the government to meet its burden, we decline to establish a rule as to when that becomes necessary. In those cases, as in this one, we evaluate the government's evidence—whether direct or

circumstantial—under the totality of the circumstances to determine whether the government has established the substantial connection by a preponderance of the evidence. Because "[e]ach forfeiture proceeding is based upon unique circumstances," this evaluation is a fact-intensive inquiry. *United States v. Certain Real Prop. Located at 2525 Leroy Lane*, 910 F.2d 343, 349 (6th Cir. 1990). We now examine the evidence to determine whether the Government has met its burden with the evidence presented here and if so, whether Winston presented rebuttal evidence of legitimate income or innocent ownership.

### 2. Totality of the Circumstances

As discussed in the expense calculations above, the presence of significant legitimate income and relatively modest personal expenses requires a close review of the evidence presented at Winston's trial on remand. Under the totality of the circumstances approach, "[w]e review each of these facts in turn to determine whether, in the aggregate, the evidence establishes [the government's burden]." *$5,000.00 in U.S. Currency*, 40 F.3d at 849. We "must also consider the relative strengths and weaknesses of that evidence." *$67,220.00 in U.S. Currency*, 957 F.2d at 286.

The Government relies on four categories of evidence. First, Winston in fact trafficked drugs. As we have explained in *Marcy I*, the "mere fact that a claimant previously had been convicted of a drug offense" does not "necessarily prove[] the substantial connection between property and illegal activities that would establish, by a preponderance of the evidence, that the property should be forfeited." *Marcy I*, 659 F. App'x at 218. A drug trafficking conviction alone cannot justify forfeiture, as "[p]lacement of such a permanent, immutable stigma upon an individual contravenes all notions of fair play and due process." *Id.* Winston, however, pleaded guilty to participating in drug trafficking and concedes that he made—and spent—drug trafficking proceeds in 2012. It is undisputed that Winston could have used legitimate income *or* contemporaneously earned drug proceeds to purchase the Property.

Second, Winston withheld information from the Government by not revealing his interest in the Property to the district court's pretrial services and probation departments. We take into account, as part of the totality of the circumstances, whether the claimant "withheld information

from[] authorities." *$99,990.00 in U.S. Currency*, 69 F. App'x at 763. We have acknowledged, albeit in a different context, that "[l]aundering of drug profits is not the only plausible explanation for concealing assets," and "[l]egitimate income is often hidden from creditors and tax agents." *United States v. McDougald*, 990 F.2d 259, 262 (6th Cir. 1993). But Winston's misleading statements about the Property can also be understood as support for the Government's contention that he purchased the Property with illegitimate funds, especially in conjunction with the other circumstantial evidence.

Third, at the summary judgment proceedings, Winston substantially misrepresented his legitimate income in 2012, the year in which he purchased the Property. Winston's 2012 tax return reveals that he made only $16,243, not the $150,000 of legitimate income that he claimed at summary judgment. Winston agreed to purchase the Property at issue for $36,500, and in fact paid $26,500, a sum appreciably exceeding his 2012 legitimate income.

Finally, the Government emphasizes that Winston's legitimate income was insufficient to cover his expenses if the drug trafficking expenses were correctly included in the trial court's expense calculation. Adjusting for the district court's calculation errors, between 2009 and 2012, Winston earned $169,132 in legitimate income but spent $227,371, including the warehouse rentals and Johnson payments totaling $93,966. *See* Table 1 above. If we find that the trial court did not clearly err by including the warehouse rentals and Johnson payments in Winston's unrebutted expenses, Winston does not have adequate legitimate income remaining to purchase the Property for $26,500. And "evidence of legitimate income that is insufficient to explain the large amount of property seized, unrebutted by any evidence pointing to any other source of legitimate income or any evidence indicating innocent ownership, satisfies the burden imposed by [CAFRA]." *$174,206.00 in U.S. Currency*, 320 F.3d at 662.

Winston argues that he rebutted the Government's evidence by showing that he did not use his legitimate income to pay the $93,966 of drug trafficking expenses, leaving $28,852 of legitimate income to purchase the Property. He relies solely on IRS agent Clark's testimony that in general, drug traffickers spend their drug proceeds on their drug business and that Winston probably did so. The trial court also found that "[l]arge-scale trafficking of marijuana in the Columbus area, akin to Winston's during the relevant time period, is highly lucrative." Winston

did not provide any other evidence that he used drug trafficking proceeds to fund his drug business or that he purchased the Property with legitimate income.

The evidence here presents two "possible stories" about how Winston paid for the warehouses and Johnson's services, and, by extension, how much legitimate income he had remaining to purchase the Property. *United States v. Assorted Jewelry Approximately Valued of $44,328.00*, 833 F.3d 13, 16 (1st Cir. 2016). Winston argues that the Government has not met its burden to "tip the scale" toward connecting the Property to drug sale proceeds. *Id.* at 17.

Even assuming that the trial court may have erred by including the drug trafficking expenses in its calculation of Winston's unrebutted expenses, the Government's "cumulation of . . . evidence" is strong enough to make its explanation more likely than any explanation proffered by the claimant. *$110,873.00 in U.S. Currency*, 159 F. App'x at 652. Based on the court's calculations, Winston spent $68,114 more than he earned in legitimate income between 2009 and 2012. Thus, although the calculations regarding Winston's expenses and his legitimate income cannot independently indicate which items he purchased with legitimate income or drug proceeds, they do reveal that Winston purchased *something* with drug money, as his legitimate income of $169,132 was insufficient to cover all of his known expenses between 2009 and 2012. The additional facts described in the Government's first three categories of evidence—that Winston was trafficking in drugs at the time he purchased the Property, purchased the Property with $26,000 in cash installments, failed to reveal his interest in the Property to authorities, and lied about his legitimate income in the year that he purchased the Property—makes it more likely than not that he used the drug proceeds to pay for the Property.

Winston argues that this analysis is a "thinly-disguised effort to invoke the substitute assets remedy" under 18 U.S.C. § 853(p). In criminal forfeiture actions, that statute provides for forfeiture of property that is itself not connected to illegal activity but serves as a substitute for forfeitable property that cannot be located or is otherwise unavailable to fulfill the authorized forfeiture. 18 U.S.C. §853(p). By contrast, the CSA's civil forfeiture provision does not permit forfeiture of "innocent" property. For example, here, the Government could not rely on a 21 U.S.C. § 881(a)(6) proceeds theory to show a substantial connection between drug trafficking and Winston's Ford Taurus, for which he made monthly auto payments from legitimate income,

or 999 Cummington, which was financed by a VA loan and paid with legitimate income. But the Government may rely on the following evidence: in 2012, Winston made only $16,243 in legitimate income, not the $150,000 originally claimed; Winston's misrepresented his legitimate income during the time at which he bought the Property; and Winston failed to report his interest in the Property. This evidence suggests a connection between Winston's illegitimate income and the Property that he purchased with $26,500 in cash.

The presence of significant legitimate income makes this case more difficult. On the totality of the evidence in the record, however, Winston has failed to rebut the Government's proof that the Property was purchased with illegitimate income. Unlike the claimant in *Veggacado*, who provided evidence that persuaded the jury that some of his property was either inherited from his mother or purchased with his wife's legitimate income, Winston has not shown that his explanation is at least as likely as the Government's. 37 F. App'x at 190. Nor is this case still at summary judgment, where Winston need only present a dispute of material fact, rather than sufficient evidence to rebut the Government's case. *See $99,990.00 in U.S. Currency*, 69 F. App'x at 763–64. The cumulative effect of the evidence presented is sufficient to satisfy the Government's burden to show that a substantial connection between the property and the underlying criminal activity was more likely than not. *See $110,873.00 in U.S. Currency*, 159 F. App'x at 652.

### III. CONCLUSION

Because the Government met its burden to establish, by a preponderance of the evidence, a substantial connection between the Property and illegal drug sale proceeds and its case was not rebutted, the Property is forfeitable under 21 U.S.C. § 881(a)(6). We **AFFIRM** the judgment of the court below.